UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. 21-93 (RC) |
| | ) |
| JOHN D. ANDRIES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

### DEFENDANT'S MOTION TO DISMISS COUNTS ONE, TWO, AND THREE OF THE SUPERSEDING INDICTMENT

The defendant, John Andries, files this motion to dismiss counts 1-3 of the Superseding Indictment, pursuant to Fed. R. Crim. P. 12(b). For the reasons discussed below, counts 1-3 fail to state an offense and fail to give proper notice to the defendant.

### BACKGROUND

On January 28, 2021, John Andries was charged in a complaint with Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority in violation of 18 U.S.C. §1752(a)(1)&(2), and Violent Entry and Disorderly Conduct on Capitol Grounds in violation of 40 U.S.C. §5104(e)(2)(E)(D)&(G). *See* ECF Dkt. No. 1. On February 8, 2021, the government filed an Information alleging the same offenses. *See* ECF Dkt. No. 5. On May 26, 2021, the government filed a Superseding Indictment adding a felony charge of Obstruction of an Official Proceeding in violation of 18 U.S.C. §§1512(c)(2) & 2. *See* ECF Dkt. No. 15.

### LEGAL AUTHORITY

The Indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment "must provide

1

the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent prosecution for the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury." *United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.C. Cir. 2017) (citing *Russell v. United States*, 369 U.S. 749 (1962), and *Stirone v. United States*, 361 U.S. 212 (1960)). A criminal defendant "may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Rule 12 provides that a defendant may also move to dismiss the Indictment for "failure to state an offense" and "lack of specificity." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259 (1997). The "void-for-vagueness doctrine" protects against arbitrary or discriminatory law enforcement. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

The rule of lenity applies if the terms of the statute are ambiguous; once it is determined that a statute is ambiguous, the rule of lenity "requires that the more lenient interpretation prevail." *United States v. R.L.C.*, 503 U.S. 291, 293 (1992). This rule is rooted in "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id*. at 305 (quoting *United States v. Bass*, 404 U.S. 348, 336 (1971)). The Courts have "[r]eserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating

2

policies of the statute." *Id*. (citing *Moskal v. United States*, 498 U.S. 103, 108 (1990)).

"Whether a statutory term is unambiguous … does not turn solely on dictionary definitions of its component words.  Rather, 'the plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole.  *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co*., 519 U.S. 337, 341 (1997)).

## ARGUMENT

### I.  18 U.S.C. §1512(c)(2) as alleged in the Superseding Indictment Fails to State an Offense

#### a.  Congressional Intent and Statutory Construction of 18 U.S.C. §1512(c)(2)

After analyzing the congressional intent and plain meaning of the statute, it is clear that the purpose of the law is to protect the integrity of hearings before tribunals by preventing witness tampering and destruction of evidence.

18 U.S.C. §1512(c) provides: "Whoever corruptly –

(1) Alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) Otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so…shall be fine….or imprisoned…

§1512(c). An "official proceeding" is defined as –

(1) A proceeding before a judge or court of the United States, a United states magistrate judge, bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

(2) A proceeding before the Congress;

(3) A proceeding before a Federal Government agency which is

3

...

>
> authorized by law; or
>
> (4) A proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce;

§1515(a)(1).

18 U.S.C. §1512(c) was enacted as part of the Sarbanes-Oxley Act of 2002, which was titled "Corporate Fraud Accountability," and which targeted "corporate malfeasance." Pub.L. No. 107-204, 116 Stat. 745. Sarbanes-Oxley was designed to "protect investors and restore trust in financial markets following the collapse of the Enron Corporation" after revelations that Enron's outside auditor had "systematically destroyed potentially incriminating documents." *Yates v. U.S.* 574 U.S. 528, 532 (2015). Given the context and purpose of the Sarbanes-Oxley legislation, the Supreme Court narrowly interpreted the term "tangible object" in §1519, which penalized

> [w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States…..

18 U.S.C. §1519. Keeping in mind that in the Sarbanes-Oxley Act, "Congress trained its attention on corporate and accounting deception and cover-ups" *id.* at 532, the Court held that the Act did not contemplate penalizing the act of tossing undersized fish overboard to avoid the consequences of an inspection by federal authorities. Rather, in the context of the statute's purpose, a "tangible object" must be one used to record or preserve information." *Id*. So while fish are in fact tangible objects in the ordinary sense of that phrase, they do not qualify as tangible objects for purposes of §1519.

In an amendment to §1512, the Sarbanes-Oxley Act added the current subsection (c)(2), which penalizes corruptly obstructing, influencing, or impeding "any official proceeding." The term "official proceeding" is defined in §1515 to include a proceeding "before a judge or court of the United States" and a proceeding "before the Congress." Like the phrase "tangible objects" in §1519, the phrase "official proceeding" in §1512 requires interpretation. "Dictionary definitions of the term 'proceeding' alone…cannot conclusively resolve" whether a proceeding is an "official proceeding" under §1512. *United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013). Courts have also interpreted "official proceeding" to imply something formal. *See, e.g., United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106; *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) ) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because the term encompasses "events that are best thought of as hearings (or something akin to hearings"). As with the phrase "tangible object" in §1519, the phrase "official proceeding" must be interpreted in light of the statute's purpose, which is "to enhance and protect the necessary role of crime victims and witnesses in the criminal justice process." *United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008).

In light of the context of this "witness tampering" statute, an "official proceeding before the Congress" contemplates the same type of "adversarial nature" as court proceedings where there is a potential for witnesses to be influenced or documents to be destroyed. *See* S.Rep. No. 107-146, at *6 (2002). "[T]he charged conduct must have some reasonable nexus to a record, document or tangible object," *United States v. Singleton*, 2006 WL 1984467 *3 (S.D. Texas 2006), or to witness testimony, *United States v. Kumar*, 617 F.3d 612, 619-20 (2d Cir. 2010), and

5

the obstruction must concern a proceeding involving adjudicative or at least "quasi-adjudicative responsibilities." *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009).  For example, in *Ermoian*, 752 F.3d at 1170-71, the court held that an "official proceeding" suggests a "formal appearance before a tribunal;" an FBI field investigation did not qualify.  The court held that "when examining the term 'proceeding' within the grammatical structure of the definition at issue, it becomes clear that the term connotes some type of formal hearing." *Id*.  Most importantly, the court focused on the contextual language that §1512 uses when referring to "official proceeding."  The Court explained that §1512 refers to "preventing the attendance or testimony of any person"; "preventing the production of a record, document, or other object, in an official proceeding; and being absent from an official proceeding to which that person has been summoned by legal process." *Id*. at 1171-1172.  It was important to the Court that the use of the words, "testimony," "attendance," "production," and "summons," "strongly implies a hearing before a formal tribunal." *Id.* at 1172.  *Accord United States v. McDaniel*, 2014 WL 2084891 (N.D. Georgia 2014) ("official proceeding" for purposes of §1512(c) did not include an FBI investigation); *Sutherland* at 921 F.3d 421, (the term "proceeding" implies 'some formal convocation….in which parties are directed to appear") (quoting *United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019)).[1]

### b. The Electoral Count on January 6 is not an "Official Proceeding"

When considering the legislative history of 18 U.S.C. §1512 and Congress's role in counting the electoral votes pursuant to the 12th Amendment and the Electoral Count Act of

---

[1] The D.C. Circuit has not addressed the question, except in a pre-Sarbane-Oxley version of § 1512, one that did not include the current subsection (c)(2), where the Court held that by entering into a plan to encourage others to falsify documents and to testify falsely before the Inspector General in a matter that was to be passed to the grand jury, the defendant obstructed an official proceeding.  *United States v. Kelley*, 36 F.3d 1118, 1123 (D.C. Cir. 1994).

1887, later codified in 3 U.S.C. §15, the electoral count is clearly a ceremonial and administrative event that is not an "official proceeding" contemplated in §1512; it is not an adjudicative proceeding involving witness testimony and evidence.  The Twelfth Amendment and the Electoral Count Act of 1887 place the responsibility on Congress to count electoral votes after the states have already heard any disputes and certified the vote.  *Bush v. Gore*, 531 U.S. 98, 154 (2000) (Breyer, J., dissenting).  Members of Congress may make an objection, in writing, and without argument. 3 U.S.C. §15.  According to the statute, there is no testimony, no witnesses, no argument, and no evidence.

The purpose of the Electoral Count Act of 1887 was to resolve years of confusion as to what exactly Congress's role was in counting the electoral votes.  The seven sections of the Act attempt to do five things:

> (1) Give the states enough time between election day and elector balloting day to settle controversies over the appointment of their presidential electors (Section 1);
>
> (2) Encourage the states to establish mechanisms for resolving contests over the appointment of presidential electors prior to the day of electoral balloting (Section 2);
>
> (3) Publicize and place on the record the states' determination of the outcome of their electoral appointment process (Section 3)'
>
> (4) Minimize congressional involvement in resolving controversies over elector appointment not authoritatively resolved by the states (Section 4);
>
> (5) Settle procedural issues for conducting the joint session at which Congress counts the states' electoral votes (Sections 4-7).[2]

The sponsors of the Electoral Count Act hoped that "if the disputes touching the

---

[2] Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 FLLR 541, 578 (2004)

Constitution of the Electoral Colleges in the States could be disposed of in advance of their action, the counting of the electoral votes at the seat of government…would be usually a little more than a *formal ceremony*."[3]  Section 5 of the Act provides that the "State's selection of electors "shall be conclusive, and shall govern in the counting of the electoral votes" if the procedural rules have been followed.  *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, J., concurrence).  Thus, the legislative history of the Act suggests that the Electoral Count is intended to be a "ceremonial" finalization of the votes that have already been certified by the states to ensure that certain requirements have been met before the votes are finalized and recorded.  So while Congress is in session on January 6, it is not the "proceeding before Congress" for purposes of §18 U.S.C. 1512(c) and 1515(b).

The basis of count one of the Superseding Indictment is that Mr. Andries intended to "impede or influence" Congress's certification of the Electoral College vote on the basis that the "ceremonial" certification is an "official proceeding."  As outlined by the congressional intent of 18 U.S.C. §1512(c) and the legislative history and purpose of the Electoral Act of 1887, "obstruction of an official proceeding before Congress" was never intended to apply to an event that involves no witness testimony, documentary or tangible evidence, or meaningful adjudication.  Of course, most-if not all- of congressional hearings *do* involve witness testimony and documentary evidence, and allow Congress to exercise their investigatory power.  Section 1512(c) is designed to protect the integrity of witness testimony and evidence at those proceedings.  *See generally United States v. Poindexter*, 951 F.2d 369, 382 (D.C. Cir. 1991) (discussing how the Victim and Witness Protection Act of 1982 created a new provision, §1512,

---

[3] Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 FLLR 541, 585 (2004) (quoting Senator George Edmunds in H.R. Misc. Doc. No. 44-13, supra note 31, at 18).

which prohibits various forms of witness tampering).  Moreover, counting the electoral college votes is not an adjudicative proceeding.  Congress was tasked with merely ensuring that the requirements for certification have been followed after the states have already made the determination that the votes were lawfully certified.

The administrative and ceremonial proceeding was not the target of §1512(c).  The government's own definition of a congressional hearing makes this distinction clear.  According to Govinfo.com, a congressional hearing is:

> A meeting or session of the Senate, House, Joint, or Special Committee of Congress, usually open to the public, to obtain information on proposed legislation, conduct an investigation, or evaluate/oversee the activities of a government department, or the implementation of a federal law.  In addition, hearings may also be purely exploratory in nature, providing testimony and data about topics of current interest.

*See* Congressional Hearings | govinfo.  The electoral vote counting is not included in this description because it does not have the same characteristics as a congressional hearing.  In fact, when searching through the record of past congressional hearings, there is a standard format that is applied to each hearing that is similar to a "hearing before a tribunal." *Id*.  The government cannot conveniently group the unique tradition of the Electoral Count with every other Congressional hearing as they are completely different and possess different functions and characteristics.  The government also cannot ignore years of precedent and legislative history where the clear purpose of 18 U.S.C. §1512(c)(2) is to protect the integrity of hearings where there is a potential for destruction of documents and witness tampering.

    **c. Even if the Court determines that the Electoral Count is an "Official Proceeding," 18 U.S.C. §1512(C)(2) is Unconstitutionally Vague as Applied to this case**

Under the same principles of *United States v. Johnson,* 576 U.S. 591 (2015) and its

9

progeny, 18 U.S.C. §1512(c)(2) violates due process as it is vague and does not provide fair notice to Mr. Andries as to the conduct it punishes. The statute provides that:

"Whoever *corruptly* –

1. Alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an *official proceeding*; or

2. *Otherwise obstructs, influences, or impedes any official proceeding*, or attempts to do so…shall be fine….or imprisoned…

18 U.S.C. §1512(c)(1)(2)(emphasis added).  First, §1512(c) uses words throughout both sections that require courts to speculate as to their meaning in the context of the defendant's particular actions.  Courts must speculate as to the meaning of the word "corruptly" and the phrase "official proceeding." Even more problematic is that subsection (c)(2) is a "residual clause," one that is ambiguous and that requires Courts to determine exactly what line must be drawn in order to determine if a defendant is "otherwise" obstructing, impeding, or influencing an official proceeding before Congress.

The Court in *Johnson* explained that "the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." *Johnson,* 576 U.S. at 597.  There, the Court found a due process violation where a defendant's sentence was enhanced by the residual clause in the Armed Career Criminal Act if the prior felony "involved conduct that presented a serious potential risk of physical injury to another." *Johnson*, 576 U.S. 591.  The residual clause violated due process because it required speculation in each case as to what could potentially cause injury in each set of circumstances.  *Id*. at 598.  The ambiguity caused a wide range of interpretation and disparity among courts over the course of nine years and the Court acknowledged that the "failure of

10

persistent efforts to establish a standard can provide evidence of vagueness." *Id.* Similarly, the discussion above regarding what constitutes an "official proceeding" illustrates just part of the confusion and lack of cohesiveness among jurisdictions as to what qualifies as an "official proceeding" and what does not. In fact, there has not been any established standard to apply across all cases. The courts have had to speculate and attempt to draw a line to distinguish "official proceedings" from just mere ancillary proceedings or investigations. As discussed above, courts have generally interpreted "official proceeding" to mean something more than an investigation and something more formal, however there has been no established standard and it has left ambiguity among the courts. *See United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006); *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019); *United States v. McDaniel*, 2014 WL 2084891 (N.D. Georgia 2014).

The vagueness of the statute is not limited to the confusion surrounding what constitutes an "official proceeding." The D.C. Circuit has acknowledged that the word "corruptly" is vague on its face as used in a similar statute, 18 U.S.C. §1505, that prohibits obstruction of a proceeding before departments, agencies or congressional investigations. The court held that "in the absence of some narrowing gloss, people must guess at its meaning and application." *United States v. Poindexter*, 951 F.2d 369, 398 (D.C. Cir. 1991). Previously, in *Ricks v. District of Columbia*, 414 F.2d 1097 (D.C. Cir. 1968), the court held a statute that criminalized "leading an immoral or profligate life" vague because it found "immoral" to be synonymous with "corrupt, depraved, indecent, dissolute, all of which would result in "an almost boundless area for the individual assessment of another's behavior." *Poindexter*, 951 F.2d. at 399 (quoting *Ricks*, 414 F.2d at 1097. The court explained that various dictionary definitions of the word "corrupt" did

11

not reduce the confusion as to its meaning for purposes of the statute. *Id*. After an assessment of the legislative history and judicial interpretation, the court concluded that neither of those inquiries provided defendants with the constitutionally required notice that the statute requires, and found the term vague as applied to the defendant making false statements. *Id.* at 406.

Following *Poindexter*, Congress amended §1515 to define "corruptly" for purposes of §1505 only to mean "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." §1515(b). However, this amendment did not resolve the vagueness that still exists in §1512 as Congress did not amend §1515 as it applies to §1512.

Even though the D.C. Circuit later held that the word "corruptly" was not vague as applied, it was because in that case the defendant influenced a witness which fit squarely within the non-vague category that *Poindexter* established. *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996). In *Morrison*, the defendant tried to influence a witness's testimony and "exhorted her to violate her legal duty to testify truthfully in court." *Id*. The Court in *Poindexter* explained that influencing another to "violate their legal duty" was not vague because "it would both take account of the context in which the term "corruptly" appears and avoid the vagueness inherent in words like "immorally." *Poindexter*, 951 F.2d at 379. However, *Morrison* was not faced with the question of what "corruptly" means in the context of Section 1512(c) and does not resolve the ambiguity that the word presents in conjunction with the rest of the statute. Even taking "corruptly influences" together is still vague because "influence" alone is another vague word and means something different than "influencing another to violate their legal duty" as described in §1515.

12

Analyzing the government's approach to charging defendants with a violation of §1512(c)(2) arising out of events on January 6, 2021, illustrates how vague and arbitrary the enforcement of this statute can be. It appears as though the government has been inconsistent in its charging decisions. It has attempted to draw some bright line rules by charging individuals with a violation of §1512(c)(2) if defendants entered the Senate floor.[4] However, when taking a look at some of the defendants that have been charged with a violation of §1512(c)(2), the inconsistencies become clear.

(1) *United States v. Isaac Sturgeon*, 21-CR-91: Defendant alleged to have assisted in pushing a barricade outside the Capitol building but never entered the Senate chamber, never went inside the Capitol building, and never made any threats to law enforcement or statements on social media suggesting he wished to disrupt the vote. Mr. Sturgeon is also not alleged to be a part of the Oath Keepers or the Proud Boys.

(2) *United States v. Kenneth Grayson,* 21-CR-224: Defendant alleged to have entered Capitol building, but not alleged to have entered the Senate chamber. Prior to January 6, 2021, he allegedly wrote in a private message, "I am there for the greatest celebration of all time after Pence leads the Senate flip! OR IM THERE IF TRUMP TELLS US TO STORM THE FUKIN CAPITOL IME DO THAT THEN!

(3) *United States v. Benjamin Larocca,* 21-CR-317: Defendant allegedly entered Capitol building while screaming "Our House!" Was with an individual who allegedly was yelling, "You fucking oath breakers!" Mr. Larocca is not alleged to have entered the Senate floor and is not a member of the Proud Boys or Oath Keepers.

---

[4] *See United States v. Paul Hodgkins*, 1:21-CR-188 (RDM); *United States v. Tommy Allan*, 1:21-CR-064 (CKK); *United States v. Jacob Chansley*, 1:21-CR-003 (RCL); *United States v. Bradley Bennett*, 1:21-CR-312 (JEB); United States v. Leo Brent Bozell IV, 1:21-cr-216 (JDB) (not alleged to be a member of the Proud Boys or the Oath Keepers).

(4) *United States v. Sean Michael McHugh,* 21-CR-436:  Defendant allegedly employed bear spray in direction of officers and yelled insults at officers.  Also allegedly used a megaphone and engaged crowd with chants, such as "our house!"  No evidence he entered the Capitol building or the Senate floor.

(5) *United States v. Dale Jeremiah Shalvey,* 21-CR-334:  Defendant allegedly entered the Senate Chamber and is captured on video rummaging through Senator Cruz's notes.  However, he is not alleged to be a part of the Oath Keepers or the Proud Boys.

As illustrated by these cases, the facts and circumstances of each case vary drastically from each other and make it clear that the government's charging decisions are inconsistent.  Some cases alleged entry into the Capitol building while others do not.  More importantly, the government does not specify what "influence" these defendants had or how exactly they "impeded."  In the instant matter, Mr. Andries was charged with only misdemeanors initially but the government later superseded to add one count of felony obstruction.  *See* ECF Dkt. No 15.  The only basis for that appears to be that he allegedly entered the Capitol building and made statements similar to many of the other political statements that have been uttered by several defendants.  The inconsistent charging decisions along with the inherently vague words in the statute, as well as the "residual clause" that is the basis for charging these defendants all show that 18 U.S.C. §1512(c)(2) is unconstitutionally vague and does not provide fair notice to Mr. Andries.

**II.      18 U.S.C. §1752 fails to state an offense**

    **a. The United States Secret Service is the Entity that Governs Designating "Restricted Areas" under the statute and not the United States Capitol Police**

Mr. Andries is charged with two counts of violating 18 U.S.C. §1752 for "entering and remaining in a Restricted Building or Grounds," and engaging in "disorderly and disruptive

14

conduct in a Restricted Building or Grounds." *See* ECF Dkt. No 15.  When this statute was enacted, it is clear that the purpose was to designate the United States Secret Service ("USSS") to restrict areas for temporary visits by the President.  *See* S. Rep. No. 91-1252 (1970).  At the time of enactment, the USSS was part of the Treasury.  Section 1752 grants the Treasury Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President."  18 U.S.C. §1752(d)(1).  It also allows the Secretary to "to prescribe regulations governing ingress or egress to such buildings and grounds to be posted, cordoned off, or otherwise restricted areas where the President may be visiting." §1752(d)(2).  There is nothing in the legislative history to suggest that anyone other than the USSS has the authority to so restrict the areas surrounding the Capitol building.

> The USSS's duties and responsibilities are outlined in 18 U.S.C. §3056, which include:
>
> > (e)(1): When directed by the President, the United States Secret Service is authorized to participate, under the direction of the Secretary of Homeland Security, in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President.
> >
> > (2) At the end of each fiscal year, the President through such agency or office as the President may designate, shall report to the Congress--
>
> **(A)** what events, if any, were designated special events of national significance for security purposes under paragraph (1); and
>
> **(B)** the criteria and information used in making each designation.

§3056(e)(1)(2)(A)(B).  The statute does not state that any other agency is permitted to designate events for security purposes and only explains that the USSS would be under the designation of the Department of Homeland Security instead of the Treasury Department.  The statute makes the exclusive role of the USSS even clearer in §3056(g), which states:

> (g) The United States Secret Service shall be maintained as a

15

> *distinct entity* within the Department of Homeland Security and shall not be merged with any other Department function. *No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service*, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department.

(Emphasis added).

### b. The Government does not allege that the Secret Service Restricted the Capitol Grounds on January 6, 2021

The Superseding Indictment charges Mr. Andries with remaining or entering "restricted building or grounds," however does not allege that the USSS designated that area as being restricted. In fact, in *United States v. Griffen*, the government conceded that the United States Capitol Police were responsible for the restricted designations on that day and not the USSS. 21-CR-92 (TNM) at Dkt. No. 33. The court in *Griffen* denied a motion to dismiss §1752 based on a similar argument on the ground that the statute (Congress) did not specifically state who must designate the "restricted areas." *Id*. at Dkt. No. 41. However, the plain reading of 18 U.S.C. §1752(c)(B), defines "restricted building or grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." This language is how the government has chosen to state the offense in the Superseding Indictment. *See* ECF Dkt. 15. Since it is the Secret Service who protects the President or "other person," it is the Secret Service who must designate the area "restricted." The legislative history bolsters this interpretation.[5]

---

[5] Congress enacted 18 U.S.C. §1752 as part of the Omnibus Crime Control Act of 1970. Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan 2. 1971). At that time, the USSS was a part of the Treasury Department. The Senate Judiciary Committee report accompanying the current version of §1752 noted that there was no federal statute that specifically authorized the Secret Service to restrict areas where the President maintains temporary residences and the senators explained that the key purpose of the bill was to provide that authority to the Secret Service. S. Rep. No. 91-1252 (1970).

The court in *Griffen* also gave an example of the result that would occur if the defense's interpretation of the statute holds muster, such as the President not being able to rely on the military fortification at Camp David already in existence when he visits that facility because the Secret Service was not the one to restrict the area. *See Griffen* ECF Dkt. No. 41 at pg. 11. However, each military base has laws that protect the facility against intruders. For example, 18 U.S.C §1382 prohibits any person from entering any military installation for any purpose prohibited by law. Military bases are heavily guarded and have entrance and exit points and are different than federal buildings that need sections to be "cordoned" off in order for the general public to know which area is restricted. Furthermore, if the deficiency of a statute creates an absurd result or creates arbitrary enforcement, it must be amended to provide clarity and provide fair notice to a defendant. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Lastly, if there is no designation as to "who must" restrict the area, it could create another absurd result which would be that anyone claiming to be a part of law enforcement could post a sign designating an area as restricted and a criminal defendant could then be penalized for trespassing because they "willfully" ignored the sign.

## **CONCLUSION**

For all of the reasons discussed above, the defendant John Andries, respectfully requests that the Court dismiss counts 1-3 of the Superseding Indictment because they fail to state an offense and do not provide fair notice.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
Maria N. Jacob
D.C. Bar No. 1031486
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500
Maria_Jacob@fd.org