## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-93 (RC)** |
| **v.** | : | |
| | : | |
| **JOHN D. ANDRIES,** | : | |
| | : | |
| **Defendant.** | : | |

## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNTS ONE, TWO, AND THREE OF THE SUPERSEDING INDICTMENT

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully opposes defendant John Andries' Motion to Dismiss Counts One, Two, and Three of the Superseding Indictment, which charges him in Count One with obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), and in Counts Two and Three with entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1), and disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2).  In his motion, the defendant claims that Congress's constitutionally mandated process of counting the Electoral College votes of the presidential election was not "adversarial" enough to be an "official proceeding."  But nowhere does the defendant address the fact that a Joint Session of Congress—a proceeding enshrined in and prescribed by the United States Constitution and federal law—plainly constitutes "a proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and therefore is an "official proceeding" under § 1512(c)(2).  He further argues that, in any event, the statute itself is unconstitutionally vague as applied to this case.  Finally, the defendant challenges Counts Two and Three of the Superseding Indictment, asserting the government failed to properly allege in the Superseding Indictment that the Capitol grounds were a restricted area on January 6, 2021 because

the United States Secret Service (Secret Service) is the sole entity that may designate an area "restricted," and the government instead improperly relied on such designation by the United States Capitol Police (USCP).

Defendant's motion is unsupported by the law and should be denied.

## PROCEDURAL HISTORY

The Grand Jury returned a superseding indictment charging the defendant, John Andries, with obstructing the Electoral College vote that took place at the United States Capitol on January 6, 2021, in violation of 18 U.S.C. § 1512(c)(2).  The Grand Jury further charged him with one count of entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); one count of disorderly and disruptive conduct, in violation of 18 U.S.C. § 1752(a)(2); and two misdemeanor offenses under 40 U.S.C. § 5104(e)(2).  Doc. 15, at 1-3.  These charges implicate the defendant's conduct at the U.S. Capitol on January 6, 2021.

The defendant filed a motion to dismiss Counts One, Two, and Three of the Superseding Indictment, Doc. No. 20. Count One charges him with obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2); Count Two with entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); and Count Three with disorderly and disruptive conduct, in violation of 18 U.S.C. § 1752(a)(2).

## FACTUAL BACKGROUND

On January 6, 2021, Vice President Michael Pence and Vice President-Elect Kamala Harris, both under Secret Service protection, were present at the United States Capitol building. The U.S. Capitol Police ("USCP"), with sole authority over security on the Capitol grounds, set up security barriers on the Capitol grounds. On the west side of the Capitol, USCP set up metal bike rack barriers along First Street. Within the West Front of the Capitol building, USCP set up

additional temporary metal barriers, green snow fencing, and signage stating, "Area Closed By Order of the United States Capitol Police Board." The Lower West Terrace on the West Front was closed to members of the public. Below is a map of the restricted area:



An open-source YouTube video from January 6, 2021, obtained by the Federal Bureau of Investigation, shows the defendant on the steps outside the Capitol Building with a large crowd. The crowd is attempting to break down the metal barriers to the buildings, as police offices try to hold them back, as depicted below:



Approximately 30 seconds later, the crowd breaks through the barriers and heads toward the Capitol building. The defendant can be seen walking up the stairs to the building.

The defendant entered the Capitol through a broken window near the Senate Wing Door at approximately 2:15 p.m. He then made his way through the building and was one of the first rioters to enter the Crypt. He tried unsuccessfully to move past USCP officers who stopped him. Undeterred, he waved in more rioters who began entering the room. Within minutes, the entire Crypt was full of rioters.

From the Crypt, the defendant walked to the Speaker's Lobby. Along the way, he filmed himself and surroundings, often providing commentary. In one of his self-made videos, the sound of rioters banging on the Capitol doors was palpable. Upon hearing the banging, the defendant asked, "Hey y'all think they hear us now?" He also stated, "Knock, knock motherfu**ers!" And he proclaimed, "I think the police have gotten the message: We ain't backin' down."

At approximately 2:57 p.m., the defendant left the building. Once outside he filmed himself again. While looking at the camera he stated, "We made it to the Speaker's Chambers . . . I think we're on the right side of history." He also said, "I don't know if it was me or somebody

else, but I know I tried to pull the fire alarm.  I wasn't sure if I was successful, but I know somebody did it this time for sure.  I hear it."  Audible beeping was in the background of the video.

He then joined a group of rioters who refused to leave the Capitol grounds.  Metropolitan Police Department officers were trying to clear the area; instead of leaving, the defendant sat down on a ledge.  Officers had to physically drag him from the ledge to get him to leave.

## LEGAL STANDARD

A defendant may move to dismiss an indictment or count for failure to state a claim prior to trial.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v).  "An indictment must be viewed as a whole and the allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011).  The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed.  *Id.*

Federal Rule of Criminal Procedure 7(c)(1) governs the "Nature and Contents" of an indictment. The rule states, in relevant part, that "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and that "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."  Fed. R. Crim. P. 7(c)(1).

## ARGUMENT

### A.  The certification of the Electoral College vote is an "official proceeding."

In his motion, the defendant argues that as a matter of law, the Joint Session of Congress convened for the Electoral College vote certification is not an "official proceeding" under § 1512(c) and therefore the indictment does not state a cognizable offense.  Yet he fails to grapple

with the plain language of § 1515(a)(1)(B), which defines "official proceeding" as a "proceeding before the Congress," which is precisely what he is charged with obstructing.

1. <u>Background</u>

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote. Two separate provisions in the Constitution mandate that the Vice President, while acting as the President of the Senate, "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII. Under the Electoral Count Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15. Section 15 details the steps to be followed: the President of the Senate opens the votes, hands them to two tellers from each House, ensures the votes are properly counted, and then opens the floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives." *Id.* The President of the Senate is empowered to "preserve order" during the Joint Session. 3 U.S.C. § 18. Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once." 3 U.S.C. § 17. The Electoral Act, which specifies where within the chamber Members of Congress are to sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." 3 U.S.C. § 16.

The obstruction statute with which the defendant is charged prohibits corruptly obstructing, influencing, or impeding any official proceeding. 18 U.S.C. § 1512(c)(2). An official proceeding for purposes of § 1512(c)(2) is defined as:

(A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

(B) *a proceeding before the Congress*;

(C) a proceeding before a Federal Government agency which is authorized by law; or

(D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

18 U.S.C. § 1515(a)(1) (emphasis added).

2. Certification of the Electoral College vote is a "proceeding before the Congress"

The certification of the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and, therefore, an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2). That conclusion flows principally from the obstruction statute's plain text. Skipping past the text, the defendant argues that Congress's intent and other language in the obstruction statute import a requirement that the proceeding be "adversarial" or "adjudicative" in nature. Mot. 5, 8. That argument is incorrect.

Understanding what qualifies as an official proceeding "depends heavily on the meaning of the word 'proceeding'" because "official proceeding" is defined "somewhat circularly" as, among other things, a congressional "proceeding." *See United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013). The certification of the Electoral College vote constitutes a "proceeding" under any interpretation of that term.

In its broadest and most "general sense," a proceeding refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *Id.* (quoting *Proceeding*, Oxford English Dictionary, *available at* http://www.oed.com). The defendant does

not meaningfully contest that the certification of the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is a "proceeding"—and indeed an "official proceeding"—under that general definition.  And there is good reason to construe "proceeding" as used in 18 U.S.C. § 1515 in this fashion.  Section 1515's text encompasses not only congressional proceedings, but judicial proceedings, grand jury proceedings, any legally authorized proceedings before federal government agencies, and proceedings "involving the business of insurance."  18 U.S.C. § 1515(a)(1); *see* S. Rep. No. 97-532, at 17 (1982) (noting that the "term 'official proceeding'" in the obstruction statute is "defined broadly").

But even if the "legal—rather than the lay—understanding" of proceeding governs Section 1515's interpretation, *see Ermoian*, 752 F.3d at 1170, the Electoral College vote certification qualifies.  This narrower definition includes the "business conducted by a court or other official body; a hearing."  Black's Law Dictionary, "proceeding" (11th ed. 2019).  Taken with its modifier "official," the term proceeding thus "connotes some type of formal hearing."  *Ermoian*, 752 F.3d at 1170; *see United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512").  For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in Section 1515 courts analyze the degree of formality involved in an investigation.  *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170-72 (same); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (internal investigation conducted by a review panel within the Bureau of Prisons was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*,

8

537 F.3d at 463 (internal investigation conducted by Customs and Border Patrol not an "official proceeding" because that term *"*contemplates a formal environment"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because that term encompasses "events that are best thought of as hearings (or something akin to hearings)"); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a "*formal* investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505) (emphasis added).

The formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding. *See Perez*, 575 F.3d at 169. Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true for the certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Required by law to begin at 1:00 p.m. on January 6 following a presidential election, the certification of the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body." *See* Black's Law Dictionary, *supra*. The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in a presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other

individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform").  The Electoral College vote certification, moreover, must terminate with a decision: no recess is permitted until the "the count of electoral votes" is "completed," and the "result declared." *Id.*  In short, the certification of the Electoral College vote is a "proceeding before the Congress." *See* 18 U.S.C. § 1515(a)(1)(B).

        3.   <u>The proceeding before Congress is not limited to purely "adversarial" proceedings</u>

The defendant incorrectly asks this Court to limit the interpretation of "proceeding before the Congress" to encompass only proceedings that are "adversarial" or "adjudicative" in nature like a "court proceeding where there is a potential for witnesses to be influenced or documents to be destroyed." Mot. 5, 8.  As an initial matter, it is difficult to imagine a proceeding more "official" than a constitutionally and statutorily prescribed Joint Session of Congress.  Whatever the merits of the defendant's argument for other provisions in Section 1515(a)(1), it finds no textual support when applied to Section 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress."  Had Congress wanted to import a definition that more closely resembled a quasi-adjudicative setting—like a court hearing—it needed to look only a few provisions away to 18 U.S.C. § 1505, which criminalizes obstruction of "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency.  Indeed, § 1505 expressly criminalizes obstruction of "any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees.  18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020).  Section 1505 shows that Congress knew how to limit an obstruction prohibition to congressional investigations, and that it could have also done so in the text of § 1515(a)(1)(B).  But it did not.  Instead, Congress enacted language— "a proceeding before the Congress"—to cover a broader range of proceedings than the "inquir[ies]

and investigation[s]" envisioned in Section 1505.  That distinctively broader definition includes the Electoral College vote certification.  *See, e.g.*, *Russello v. United States,* 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each.  We would not presume to ascribe this difference to a simple mistake in draftsmanship.").

Rather than engage with Section 1515's text, the defendant relies on inapposite case law and unsupported legislative history to argue that the certification of the Electoral College vote is not an "official proceeding" because it did not have "some reasonable nexus to a record, document, or tangible object, or to witness testimony."  Mot. 5.  That approach fails for several reasons.  First, it is methodologically flawed.  To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning."  *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)).  In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is "a proceeding before the Congress."  Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete."  *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted).  The defendant offers no rationale for looking past the statute's plain text to reach for other interpretive tools.

Relying principally on the Supreme Court's decision in *Yates v. United States*, 574 U.S. 528 (2015), the defendant also contends that Section 1512(c)(2) targets only "corporate malfeasance."  Mot. 4.  That contention is flawed in several respects.  The statute at issue in *Yates* was 18 U.S.C. § 1519, which prohibits altering, destroying, and concealing records, documents, and tangible objects.  *See Yates*, 574 U.S. at 532 (plurality opinion).  The Supreme Court in *Yates* held that the term "tangible object" as used in Section 1519 included only an object "used to record

or preserve information," and thus did not encompass the undersize red grouper that the defendant in *Yates* had discarded. *Id.* In reaching that conclusion, the plurality compared Section 1519 with Section 1512(c)(1), which similarly prohibits altering, destroying, or concealing evidence in connection with an official proceeding. Congress enacted both Sections 1519 and 1512(c) as part of the Sarbanes-Oxley Act of 2002, 116 Stat. 745, but drafted Section 1512(c)(1) to reach more broadly than Section 1519. *See Yates*, 574 at 543-45; *see also id.* at 545 n.7 ("Congress designed § 1519 to be interpreted apart from § 1512, not in lockstep with it.").

The statute with which the defendant is charged, Section 1512(c)(2), is broader still, expanding the obstruction prohibition beyond the focus on document destruction in Sections 1519 and Section 1512(c)(1). *See United States v. Ring*, 628 F. Supp. 2d 195, 225 (D.D.C. 2009) ("[Section] 1512(c)(2)'s application is not limited to the destruction of documents."). Its application to a defendant who "corruptly . . . otherwise obstructs, influences, or impedes any official proceeding," § 1512(c)(2), "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction, which is listed in (c)(1)." *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (affirming conviction under Section 1512(c)(2) for false statements) (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014)). Courts have repeatedly upheld its application to obstructive acts that reach beyond the impairment of financial records. *See id.* (collecting cases concerning violations of Section § 1512(c)(2) by virtue of the use of false statements); *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 2009) (upholding conviction under Section 1512(c)(2) for disclosing the identity of an undercover federal agent to thwart a grand jury investigation); *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (upholding conviction under Section 1512(c)(2) for providing false testimony to a grand jury); *United States v. Cervantes*, No. 16-10508, 2021 WL 2666684, at *6

(9th Cir. June 29, 2021) (upholding conviction under Section 1512(c)(2) for the burning of building to conceal two bodies of murder victims).

Finally, the defendant's narrowed reading of "proceeding before the Congress" in 18 U.S.C. § 1515(a)(1)(B)—importing an extra-textual "adversarial" requirement—would undercut the broad statute that Congress enacted.  His crabbed approach fails to recognize that the certification of the Electoral College vote is an official proceeding that is "crucial to the conduct of government" and therefore "entitled to go forward free of corrupting influences that not only delay [it] but increase the chances of false and unjust outcomes." *Sutherland*, 921 F.3d at 426. Under any permissible construction of the phrase "proceeding before the Congress," the Electoral College vote certification falls squarely within it.

4.  <u>In any event, certification of the Electoral College vote is adjudicative in nature.</u>

The defendant's challenge fails even if he is correct—and he is not—that a proceeding must be "adjudicative . . . involving witness testimony and evidence."  Far from informal, the certification of the Electoral College vote comprises features that resemble an adjudicative proceeding.  It involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]." 3 U.S.C. § 15.  That body convenes to render judgment on whether to certify the votes cast by Electors in the presidential election.  As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it. *Id.*  And just as a jury does not (barring a mistrial) recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result."  3 U.S.C. § 16.

5.   <u>The defendant's remaining arguments lack merit.</u>

None of the defendant's additional arguments counsels a different result.  First, the defendant implies (Mot. 5) that courts have agreed with his narrowed approach.  As noted above, those cases, like *Ermonian*, 752 F.3d at 1165, addressed an entirely different question, namely, whether law enforcement investigations qualified as "official proceedings" under a subsection defining that term as a "proceeding before a Federal Government agency which is authorized by law."  18 U.S.C. § 1515(a)(1)(C). Specifically, those courts grappled with questions such as when an agency investigation is a proceeding, *Ramos*, 537 F.3d at 462; whether the requirement in Section 1512(f)(1) that a proceeding "need not be pending or about to be instituted at the time of the offense" as applied to agency investigations would reach "conduct that occurred even pre-criminal-investigation," *Ermoian*, at 752 F.3d at 1172; and whether the "official" modifier "implies something more formal than a mere investigation," *Sutherland*, 921 F.3d at 426.  Those questions do not arise here.  The certification of the Electoral College vote is a congressional proceeding, not an investigation, and involves a degree of formality distinct from any agency investigations.  And, in any event, the pertinent statutory definition—a "proceeding before the Congress"—is phrased more broadly than the "official proceeding" definition at issue in those cases.

Second, the defendant suggests (Mot. 7-9) that the certification of the Electoral College vote is not an official proceeding but instead a mere "formal ceremony."  That suggestion is incorrect.  The law review article from which the defendant cherry-picks a quotation in which a legislator indicated his hope that the Electoral Count Act of 1887 (the Act) would render the certification of the Electoral College vote nothing more than a formal ceremony describes in detail how the Act "provides a framework for Congress's consideration of the states' electoral votes, specifies the proper grounds for members of Congress who wish to object to counting any or all

votes from a state, and provides decisional rules for cases where the Senate and House of Representatives disagree about whether to count a vote." Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla. L. Rev. 541, 651 (2004).  For example, when, as occurred during the certification on January 6, 2021, legislators withdraw to separate chambers to consider objections, they face "many difficult and ambiguous questions . . . both of law and of the law's application to the situation at hand." *Id.* at 644.  Far more than mere ceremonial formality, the certification of the Electoral College vote as established under the Act sets out procedural and substantive rules aimed at ensuring a peaceful "transmission of the supreme executive authority from one person to another."  *Id.* at 547 (quoting statements from Senators who enacted the Act).

Finally, the defendant claims that the Electoral College vote count is not an official proceeding because it is not enumerated on Govinfo.com.  Mot. 9.  As an initial matter, the defendant is conflating different terminology to lend credibility to his argument.  The defendant cites Govinfo.com's definition of a "congressional hearing," but Section 1512(c)(2) applies to obstruction of an "official proceeding."  In any event, the definition of a congressional hearing on Govinfo.com includes hearings that are "purely exploratory in nature providing testimony and data about topics of current interest."  *Id.*  Certainly, if Congress intended an "exploratory" hearing to be an "official proceeding"—as the defendant's argument implicitly suggests—it intended the certification of the Electoral College vote to also be one, given that the certification is enshrined in the Constitution and statutory law.  In any event, the certification of the Electoral College vote is recorded in the Congressional Record for posterity as one of the "proceedings and debates of the 117th Congress, First Session."  *See* 117th Cong. Rec. S13-32 (daily ed. Jan. 6, 2021); 117th Cong. Rec. H76-115 (daily ed. Jan. 6, 2021).

**B. The defendant had fair notice that 18 U.S.C. § 1512(c)(2) punished his conduct.**

The defendant argues (Mot 9-14) that Section 1512(c) is unconstitutionally vague as applied to his case.  He specifically alleges that the terms "corruptly" and "official proceeding" are vague.  This argument lacks merit.

    1.  <u>Background</u>

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from "depriv[ing] any person of life, liberty, or property, without due process of law."  An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).

The void for vagueness doctrine is narrow.  The challenger must overcome a strong presumption that duly enacted statutes are constitutional.  *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963) ("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.").  In addition, a statute is not void for vagueness simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010).  Rather, a provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application.  *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974).  The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant

16

time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

> Members of this Court have recognized the doctrine's high bar for invalidation:

> [N]o void for vagueness challenge is successful merely because a statute requires a person to conform his conduct to an imprecise but comprehensible normative standard, whose satisfaction may vary depending upon whom you ask.  Instead, unconstitutional vagueness arises only if the statute specifies no standard of conduct at all.

*United States v. Gonzalez*, No. 20-cr-40 (BAH), 2020 WL 6342948, at *7 (D.D.C. Oct. 29, 2020) (internal citation and quotation omitted); *see also United States v. Harmon*, No. 19-cr-395 (BAH), 2021 WL 1518344, at *4 (D.D.C. Apr. 16, 2021) (finding that the defendant did not meet the "stringent standard" to prevail on a Rule 12 vagueness motion).

### 2.   The word "corruptly" is not unconstitutionally vague as applied here.

Section 1512(c)(2) applies only where an individual "corruptly" performs one of the enumerated acts.   The defendant first argues (Mot. 11-12) that the term "corruptly" is unconstitutionally vague.  That argument is without merit.

The defendant relies on *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), which addressed a separate statute, 18 U.S.C. § 1505, that prohibited "corruptly" obstructing a congressional inquiry.  The D.C. Circuit held that the term "corruptly" was "vague … in the absence of some narrowing gloss."  *Id*. at 378.   The statute "does not at all clearly encompass lying to the Congress," *id*., and "the term 'corruptly' [was] too vague to provide constitutionally adequate notice" as to which lies it prohibited, *id*. at 379.

*Poindexter* is inapposite for three reasons.[1]   First, the D.C. Circuit narrowly confined *Poindexter*'s analysis to Section 1505's use of "corruptly," and expressly declined to hold "that

---

[1] *Poindexter* was also superseded in significant part by the False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459.  As codified at 18 U.S.C. § 1515(b), the Act provides

term unconstitutionally vague as applied to all conduct." 951 F.2d at 385.  Five years later, in

*United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-

based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for

"corruptly" influencing the testimony of a potential witness at trial.  *Id*. at 629-630.  Other courts

have similarly recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness

holding to its unusual circumstances."  *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir.

2017); *see also, e.g*., *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness

challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300

(11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280

(11th Cir. 1997) (same for 18 U.S.C. § 1503).  Defendant's rote incantation of *Poindexter*

accordingly fails to establish that Section 1512(c) suffers the same constitutional indeterminacy.

Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen v. United*

*States*, 544 U.S. 696 (2005).  There, the Court explained the terms "'[c]orrupt' and 'corruptly' are

normally associated with wrongful, immoral, depraved, or evil."  *Id*. at 705 (citation omitted).  In

doing so, the Court "did not imply that the term was too vague."  *Edwards*, 869 F.3d at 502.

Third, courts have encountered little difficulty when addressing Section 1512(c)'s elements

following *Arthur Andersen*.  *See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011);

*United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Watters*,

717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with

"consciousness of wrongdoing");*United States v. Matthews*, 505 F.3d 698, 706 (7th Cir. 2007)

(upholding instruction defining "corruptly" as acting "with the purpose of wrongfully impeding

---

that the term "corruptly" in § 1505 "means acting with an improper purpose, *personally or by*

*influencing another*, including making a false or misleading statement." (Emphasis added.)

the due administration of justice"); Seventh Circuit Pattern Criminal Jury Instruction for § 1512 ("A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice."); *cf.* Eleventh Circuit Pattern Criminal Jury Instruction § 058.2 (for 18 U.S.C. § 1503) ("To act 'corruptly' is to act knowingly and dishonestly for a wrongful purpose with the specific intent to subvert or undermine the integrity" of a court proceeding); Fifth Circuit Pattern Criminal Jury Instruction 2.63A (for 18 U.S.C. § 1503) (defining acting "corruptly" as acting "knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice"). Such efforts demonstrate that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries.

The defendant offers no additional cases for his column. Nor could he. "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974). In this case, the defendant entered the Capitol through a broken window alongside a mob of rioters, who then destroyed property, broke into Congressional offices, and assaulted law enforcement officers. The defendant also purportedly attempted to pull the fire alarm. This was all part of their effort to stop Congress from certifying the Electoral College vote. The defendant then confronted law enforcement officers inside the building and refused to leave the Capitol grounds, forcing officers to physically remove him.

Whatever the "uncertainty around the edges," *Edwards*, 869 F.3d at 502, Section 1512(c)'s "corruptly" element provided ample notice to the defendant that *this conduct* was criminal. His vagueness challenge accordingly fails.

3. <u>The term "official proceeding" is not unconstitutionally vague.</u>

The defendant further contends (Mot. 11) that the term "official proceeding" in Section 1512(c) is vague. As explained above, no indeterminacy exists. The Joint Session of Congress qualifies as an "official proceeding" under both the "lay" and "legal" definitions of the term. *See*

pp. 5-8, *supra*.  It also contains the necessary "adjudicatory" features to satisfy the defendant's extra-textual construction.  *Id*. at 10.  For that reason, Section 1512(c) provided him with more than "a fair warning … of what the law intends to do if a certain line [was] passed" on January 6, 2021.  *Arthur Andersen*, 544 U.S. at 703 (citation omitted).

    4.  <u>The defendant's brief survey on the government's charging decisions is flawed and irrelevant</u>

In a coda to this claim, the defendant cherry picks (Mot. 13-14) five Capitol riot cases, argues that "the[ir] facts and circumstances … vary drastically," and contends that this observation reveals vagueness.  This effort is flawed.

As a threshold matter, the government's charging decisions reflect clear consistency with Section 1512(c)(2)'s offense elements.  Each defendant had the intent to "corruptly"—through wrongdoing, such as violence and force—obstruct, interfere with, and impede the certification of the Electoral College vote count.  Their obstructive methods varied: for instance, some defendants assaulted officers outside the Capitol; others entered the Senate Chamber and rifled through Senators' paperwork.  But such factual distinctions lack salience under the statute.  Each type of conduct "corruptly" "obstruct[ed], influence[d], or impede[d]" a proceeding before Congress, accordingly, comes within the statute's scope.  18 U.S.C. § 1512(c).

Moreover, the vagueness doctrine asks whether "*the statute* … provide[s] a person of ordinary intelligence fair notice of what is prohibited."  *Williams*, 553 U.S. at 304 (emphasis added).  The defendant cites no authority, and the government has found none, showing that charging decisions postdating the offense conduct have any bearing on this inquiry.  The relevant question turns on whether the statute fairly informed the defendant that he would face criminal sanction for his conduct on January 6, 2021.  The answer is yes, for the reasons articulated above.

The defendant further states (Mot. 14) that "the government does not specify what 'influence' these defendants had or how exactly they 'impeded.'"  But the government does not have to describe in the charging instrument how it will prove those statutory elements at trial.  *See United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976) (en banc) ("[N]either the Constitution, the Federal Rules of Criminal Procedure, nor any other authority suggests that an indictment must put the defendants on notice as to every means by which the prosecution hopes to prove that the crime was committed.").  If the government fails to carry its burden on these elements at trial, the jury will say so.  But that future presentation has no bearing on the question here—whether Section 1512(c)'s text provided the defendant with adequate notice of its sweep.

### C. 18 U.S.C. § 1752 does not require the government to prove that the restricted area was restricted at the Secret Service's direction.

The defendant argues that because the Capitol Police—not the Secret Service—barricaded the area around the Capitol, he should not be charged with violating 18 U.S.C. § 1752(a)(1) and (2). Mot. 14-15.  As Judge McFadden recently concluded, that argument lacks merit.  *See United States v. Griffin*, No. 21-CR-00092 (TNM), 2021 WL 2778557 (D.D.C. July 2, 2021).

In relevant part, 18 U.S.C. § 1752 ("Restricted building or grounds") criminalizes:

(a)  Whoever—

(1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

(2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

(c) In this section—

(1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
>
> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
>
> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.
>
> (2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

18 U.S.C. § 1752.  In short, Section 1752 prohibits the unlawful entry into a restricted or otherwise cordoned off area where "a person protected by the Secret Service is or will be temporarily visiting." *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd* 831 F. App'x 513 (D.C. Cir. 2021).  Section 1752 therefore "focuses on perpetrators who knowingly enter a restricted area around a protectee, not on how it is restricted or who does the restricting." *Griffin*, 2021 WL 2778557, at *6.

To determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning."  *Levin v. United States*, 568 U.S. 503, 513 (2013) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)); *see also Pub. Investors Arbitration Bar Ass'n v. S.E.C.*, 930 F. Supp. 2d 55 (D.D.C. 2013) (Howell, J.) ("a reviewing court must accord first priority in statutory interpretation to the plain meaning of the provision in question").  Here, the plain text of the statute is "unambiguous," so the "judicial inquiry is complete." *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020).  Section 1752's text is clear. It proscribes certain conduct in and around "any restricted building or grounds." *See* 18 U.S.C. § 1752(a). The statute provides three definitions for the term "restricted buildings and grounds," *see* § 1752(c)(1), including "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President

or other person protected by the Secret Service is or will be temporarily visiting," § 1752(c)(1)(B). Through a cross-reference, Section 1752 makes clear—and the defendant does not appear to dispute—that "person[s] protected by the Secret Service" include the Vice President and the Vice President-elect. § 1752(c)(2); *see* § 3056(a)(1). The proscribed conduct within a "restricted building or grounds" includes, as relevant here, knowingly and unlawfully entering or remaining, § 1752(a)(1), and knowingly and with intent to impede or disrupt government business, engaging in "disorderly or disruptive conduct" that "in fact, impedes or disrupts" government business," § 1752(a)(2).

That straightforward analysis has a straightforward application to the facts alleged in the defendant's case. The Superseding Indictment alleges that, on January 6, 2021, a protected person was present inside the Capitol building or on the Capitol grounds, and that some portion of the Capitol building and grounds was posted, cordoned off, or otherwise restricted—making it a "restricted building or grounds" under § 1752(c)(1). The Superseding Indictment further alleges that the defendant knowingly and without lawful authority entered and remained in that restricted buildings and grounds. It also alleges that the defendant, knowingly and with the intent to impede or disrupt government business, engaged in disorderly conduct that resulted in a disruption to government business. In short, the allegations closely track the statutory language.

Looking outside Section 1752's language, the defendant urges (Mot. 16-17) the Court to import an extra-textual requirement that the Secret Service be required to designate the restricted area. That is so, the defendant claims, because (1) Section 1752(c)(B) defines "restricted building or grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting"; and (2) it is the Secret Service who protects the President and others, so it is the Secret Service who must make the designation of a restricted area. Those

arguments fail on the merits. Section 1752 is directed not at the Secret Service, but at ensuring the protection of the President and the office of the Presidency. *See* S. Rep. 91-1252 (1970); *see also* Elizabeth Craig, *Protecting the President from Protest: Using the Secret Service's Zone of Protection to Prosecute Protesters*, 9 J. Gender Race & Just. 665, 668-69 (2006). "Indeed, the only reference in the statute to the Secret Service is to its protectees. Section 1752 says nothing about who must do the restricting." *Griffin*, 2021 WL 2778557, at *7.

Second, the statutory history in fact undercuts the defendant's argument. *See id.* at *4-*5 (explaining how Congress has consistently "*broadened* the scope of the statute and the potential for liability"). An earlier version of the statute explicitly incorporated regulations promulgated by the Department of the Treasury (which at the time housed the Secret Service) governing restricted areas. *See United States v. Bursey*, 416 F.3d 301, 306-07 (4th Cir. 2005) (noting that definition of restricted area required interpreting Treasury regulations); *see* Pub. L. 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971). Congress subsequently struck subsection (d) and did not replace it with language limiting the law enforcement agencies allowed to designate a restricted area. Pub. L. 109-177, Title VI, Sec. 602, 120 Stat. 192 (Mar. 9, 2006). Congress was clearly aware that the prohibitions in 18 U.S.C. § 1752 could turn on decisions made by the Secret Service but chose not to include that in the revised statute. But Congress's decision in 2006 to eliminate reference to regulations indicates that the statute no longer depends (if it ever did) on whether the Secret Service has defined an area as "restricted."[2]

---

[2] The fact that the legislative history refers to the Secret Service does not help his argument because Section 1752 is not a "regulatory statute." *Griffin*, 2021 WL 2778557, at *4. In any event, because Section's statutory text is clear, "there is no reason to resort to legislative history." *Id.* (quoting *United States v. Gonzales*, 520 U.S. 1, 6 (1997)).

The defendant's reading of the statute, which would require the Secret Service to "cordon off" a private residence "no matter how secure the location or how imposing the preexisting walls" leads to "pressing absurdities."   *Griffin*, 2021 WL 2778557 at *6.   Nor can he escape these absurdities by offering outlandish hypotheticals of his own where, for example, fake law enforcement officers purport to restrict an area and the individuals within are prosecuted by (fake?) prosecutors.   Section 1752 sets clear limitations on where restricted areas may be established.   As relevant here, the statute only criminalizes entry into a restricted area "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting…" The statute does not criminalize an individual who enters an area in a building or grounds separate from where a Secret Service protectee is present, regardless of restrictions placed by law enforcement or anyone asserting themselves as law enforcement.

## CONCLUSION

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that the defendant's motion be denied.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793

By:     /s/ *Elizabeth Kelley*
Elizabeth C. Kelley
Douglas G. Collyer
Assistant United States Attorneys
D.C. Bar No. 1005031 (Kelley)
NDNY Bar No. 519096 (Collyer)
555 4th Street, N.W.
Washington, D.C. 20530
202-252-7238
Elizabeth.Kelley@usdoj.gov

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this opposition was sent to counsel for the defendant,

Maria Jacob, on September 2, 2021, via CM/ECF and/or by email.


___/s/_____
Elizabeth C. Kelley