UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. 21-93 (RC) |
| | ) |
| JOHN D. ANDRIES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT'S SECOND SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION
TO DISMISS COUNTS ONE, TWO, AND THREE OF THE SUPERSEDING
INDICTMENT**

The defendant, John Andries, files this supplemental argument in support of his motion to dismiss filed on August 13, 2021. *See* ECF Dkt. No. 20. The Court heard oral argument on this motion on October 5, 2021 and since the time of the hearing, four district courts issued their decisions in similar motions to dismiss. *United States v. Caldwell et al.*, 21-CR-28 (APM) (hereafter "*Caldwell*"), *United States v. Sandlin, Degrave*, 21-CR-88 (DLF) (hereafter "*Sandlin*"), *United States v. Nordean et al.,* 21-CR-175 (TJK) (hereafter "*Nordean*"), *and United States v. Montgomery, Brady, Knowlton,* 21-CR-046 (RDM) (hereafter "*Montgomery*").

Mr. Andries submits this second supplemental brief to address these decisions in further support of his motion to dismiss.

**I.   The Electoral Count is Not an Official Proceeding Under 18 U.S.C. § 1512 (c)(2),
But Rather a Ceremonial Meeting**

Four recent courts, *Caldwell*, *Sandlin*, *Nordean*, and *Montgomery,* ruled that the vote count on January 6, 2021 was a "proceeding before Congress" and therefore qualified as an "official proceeding" under 18 U.S.C. §1512(c)(2). These cases, however, do not resolve the

1

arguments raised by Mr. Andries here. While each decision defines "official proceeding," none of the decisions consider whether the electoral vote was a "proceeding" at all under any definition.

To date, no court has analyzed the ceremonial and predetermined nature of the electoral count, and how that predetermination is antithetical to the vote count being considered a "proceeding" or "hearing." The *Sandlin* court ruled that a "proceeding" need not be "court-like" and did not require the "administration of justice." *Sandlin* Opinion at 7-9.[1] The *Caldwell* and *Montgomery* courts ruled that an "official proceeding" means "the business conducted before an official body." *Caldwell* Opinion at 8-10; *Montgomery* Opinion at 13, 19. Lastly, the *Nordean* court had the most broad interpretation ruling that an "official proceeding" is a "series of actions" that requires "some formal convocation." *Nordean* Opinion at 11.

In reaching those determinations, the *Caldwell*, *Nordean*, and *Mongtomery* courts left a crucial part of the definition of "proceeding" out of its analyses. *See Caldwell* Opinion at 9; *Nordean* Opinion at 11; *Montgomery* Opinion at 11. Black's Law Dictionary defines "proceeding" to be "the business conducted by a court or other official body; *a hearing*." (11th ed. 2019) (emphasis added). The word "hearing," which was left out of the three courts definitions, provides crucial context to the definition of "proceeding" by requiring something more than a "formal convocation" or "business conducted before an official body."

Also not considered by all four district courts is whether the Joint Session is not a "proceeding" at all under any definition because the statute governing the Joint Session, 3 U.S.C. § 15, repeatedly makes clear that the Joint Session is simply a "meeting" of both Congressional bodies:

---

[1] The *Sandlin* court did, however, rule that an official proceeding must be akin to a hearing. *Id*.

> The Senate and House of Representatives shall *meet* in the Hall of the House of Representatives……..When the two Houses have voted, they shall immediately again *meet*….

3 U.S.C. § 15. (emphases added). Thus, the language of the statute governing the Joint Session plainly describe it as a "meet[ing]."

In addition, the House and the Senate do not "proceed" together; the houses always "act" separately. Proceedings take place either in the House or in the Senate, separately. The two houses convene together only for specific ceremonies and speaking events (i.e., for the State of the Union, *see* U.S. Const., Article II, Section 3, and to hear speeches from visiting dignitaries). In fact, the only time the Constitution mentions the word "proceeding" in reference to Congress, the ***bicameral*** nature of the Congress is stressed.[2] It follows that a "proceeding before Congress" in § 1512 must refer to a separate and bicameral adjudicative, investigative, or legislative function of the House or the Senate. The Electoral Certification served none of those functions.

The *Sandlin* court held that a "proceeding" must be akin to a formal hearing. *Sandlin* Opinion at 7, 9. A "hearing" is defined as a "judicial session, open to the public, held for the purpose of deciding issues of fact or of law." Black's Law Dictionary (11th ed. 2019). The Court reasoned that the vote count is a formal hearing because of the formal procedures it must follow pursuant to 3 U.S.C. § 15 that allow for objections and decisions. However, the court did not address the "ceremonial and ministerial" nature of the meeting, or consider the procedures that govern the meeting in the context of the meeting's ceremonial nature. *Sandlin* Opinion at 7-9. The ceremonial nature of the vote count, however, is crucial to determining whether or not the electoral count is akin to a formal hearing and, in turn, whether it constitutes "a proceeding."

---

[2] "Each House may determine the Rules of its *Proceedings*….[e]ach House shall keep a Journal of its *Proceedings*…" Article I Section V. (emphases added).

The vote count is entirely ministerial – it certifies vote counts that have been determined. It does not meaningfully decide any issues of fact or law because those have already been decided by the states and the courts, s*ee, e.g., Bush v. Gore*, 531 U.S. 98 (2000), and the Joint Session does not have the power under the Constitution to actually reject the votes of any State. *See* Vasan Kesavan, "*Is the Electoral Count Act Unconstitutional*?" 80 North Carolina Law Review 1653, 2002 (hereafter, "Kesavan").

The history of "objections" lodged at the Electoral Count further demonstrate the ceremonial nature of the Electoral Count. The past objections were mostly made in the 1800's because of the confusion of when new states were admitted to the union and how that impacted whether their votes should count. Objections were ultimately rejected because it was determined that the Joint Session did not have the authority to judge the proceedings already had in the states. *See* Kesavan at 1678-1694. In 1876, the most tumultuous election, Samuel Tilden and Rutherford Hayes were separated by one electoral vote and four states sent Congress multiple electoral returns. *Id.* Instead of the Joint Session resolving this issue (because Congress recognized that the Joint Session did not have the authority to do so), Congress formed a separate commission to sort through the chaos and decide the issues of fact and law presented. *Id*. Subsequently, to address issues like this in the future, Congress enacted the Electoral Count Act of 1887, placing on the states the responsibility to resolve disputes about electors and their appointments and certifications. Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla. L. Rev. 540, 543 (July 2004).

In 1969, there was an objection that a vote sent up to Congress from North Carolina should not be counted because it reflected the "faithless" elector who had refused to give his vote to Richard Nixon, despite Nixon winning the popular vote in that state. The objection was

rejected, and the vote at issue counted, because of the strong reminder of representatives such as R. Rarick who said:

> We are not election supervisors nor given the discretion to re-compute the vote received from a sovereign state. The Constitution clearly proscribes our duty as to 'count the electoral votes,' the *ministerial* function of a central *collecting agency* and a *tabulating* point.

*See Kesavan* at 1694, 2022 (emphases added).

For all these reasons, the Electoral Count is not "a proceeding" akin to a formal hearing. Rather, it is a ceremonial meeting of both houses of Congress. While steeped in tradition, it decides nothing. It is a political performance conducted in order to give the country a feeling of finality over the already final election results. As a result, the Electoral Count does not qualify as an "official proceeding" and count One of the Superseding Indictment should be dismissed.

## II.  *Sandlin, Caldwell, Nordean, and Montgomery* Did Not Resolve the Vagueness of §1512(c)(2) as Applied to Mr. Andries

In *Sandlin,* the Court refused to find the word "corruptly" vague as applied to Sandlin because it found there was a clear nexus between the alleged conduct and the intent to obstruct the vote. *Sandlin* Opinion at 24-26. In *Sandlin*, the defendants allegedly engaged in advance planning, forcibly breached the Capitol building, assaulted Capitol police officers inside the building, and encouraged others to steal paperwork from Senate Chamber. *Id*. In contrast to *Sandlin*, there is no nexus between Mr. Andries's alleged actions and an intent to obstruct the vote count.

In *Sandlin*, the Court found the term "corruptly" in §1512(c)(2) to mean "wrongfully" and "independently criminal" and therefore was not impermissibly vague in that case because the defendants' alleged behavior was so intertwined with his concerted efforts to obstruct the vote that it fit squarely within the term. *Id.* at 25. *See also Nordean* at 24 (agreeing with *Sandlin*).

5

The *Sandlin* Court noted, however, that other cases with different facts could present closer questions. *Id*.  This case is a perfect example of one that presents a closer question.  Here, Mr. Andries's conduct does not fit squarely within the core coverage of "corruptly" because his actions are not inextricably intertwined with an intent to obstruct the vote count.  Mr. Andries's alleged trespass into the Capitol building is a separate crime for which there is a separate *mens rea*.  That alleged trespass is not and should not be intertwined with an intent to obstruct the vote count without any further indication of that intent.  Mr. Andries did not engage in advance planning, assault any officers, did not threaten anyone, and did not take any actions to actually "impede" or "influence" the vote count.  Accordingly, §1512(c)(2) is vague as to Mr. Andries.

Shortly after the *Sandlin* decision, the district courts in *Caldwell* and *Nordean* also ruled that §1512(c)(2) is not impermissibly vague.  *See Caldwell* and *Nordean* Opinions.  In *Caldwell* and *Nordean*, the district courts agreed that the term "corruptly" must be understood in its intransitive form and that is why *Poindexter* does not control in a prosecution under §1512(c)(2). *Caldwell* Opinion *at* 22-33; *Nordean* Opinion at 22.  However, it is the intransitive form of the term "corruptly" that makes it especially vague in this case.  Mr. Andries did not personally act "corruptly" with respect to any intent to obstruct the vote count. Furthermore, it cannot be the alleged trespass alone that is the "corrupt" act, otherwise every single person that entered the Capitol that day would be guilty of §1512(c)(2).  It also could not have been the statements he allegedly made while inside the Capitol building because none of those statements indicated a desire to stop the vote count.  Simply put, there is no alleged action that could have put Mr. Andries on notice that he was acting corruptly while allegedly trying to stop the vote count.

The district court in *Caldwell* relied on *Arthur Anderson* and other circuit decisions that interpreted "corruptly" to require the "consciousness of wrongdoing." *Caldwell* at 23-24.  The

Court found that interpretation readily applied to the *Caldwell* defendants who were allegedly members of the Oath keepers and conspired and pre-planned their January 6, 2021 activities and that (except for one) forcibly breached the Capitol. *Id*. at 3-5 (defendants allegedly collected paramilitary gear and were armed with such gear on January 6, chatted together about plans prior to January 6, and some were allegedly part of a group that pushed through a line of officers inside the Capitol building). With those alleged facts, none of which are present here, the Court found a logical nexus existed between the inherent "consciousness of wrongdoing" and the intent to halt the vote count. *Id.* at 23-24. That same nexus, however, does not exist or apply to those individuals, like Mr. Andries, who did not plan anything in advance or assault anyone. Further, the "consciousness of wrongdoing" of the acts attributed to Mr. Andries – entering the Capitol and exclaiming his dissent over the election results– are unconnected to the intent or "consciousness" of halting a vote count.[3]

In *Montgomery*, the court also found that a "nexus" requirement is consistent with past decisions. *Montgomery* Opinion at 44-45 (defendants allegedly wore tactical vests, used violence on officers, and stormed the Senate). The court reasoned that §1512(c)(2) requires the defendant's conduct to have the "natural and probable effect of interfering with an official proceeding and the accused must have known his actions were likely to affect a particular proceeding." *Id*. (quoting *United States v. Aguilar*, 515 U.S. 593, 599 (1995). In this case, that link cannot be made. It is not reasonable to say that Mr. Andries's actions of protesting while entering the Capitol building had the "natural and probable effect" of halting the vote when there was no particular action that Mr. Andries took that could be reasonably linked to the interference

---

[3] As already established by video surveillance provided to the Court, Mr. Andries's mention of potentially pulling a fire alarm was in response to getting medical help after Ashli Babbit was fatally shot, and not an attempt to halt the vote. Furthermore, there is no evidence he pulled the fire alarm.

of the vote.

For these reasons, the statute is unconstitutionally vague as applied to Mr. Andries.

## CONCLUSION

For the foregoing reasons, Mr. Andries requests that Counts One, Two, and Three of the Superseding Indictment be dismissed.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
Maria N. Jacob
D.C. Bar No. 1031486
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500
Maria_Jacob@fd.org