**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.:  21-93 (RC) |
| | : | |
| JOHN D. ANDRIES, | : | Re Document No.:    20 |
| | : | |
| Defendant. | : | |

<u>**MEMORANDUM OPINION**</u>

**DENYING DEFENDANT'S MOTION TO DISMISS COUNTS I, II, AND III OF THE SUPERSEDING
INDICTMENT**

## I.  INTRODUCTION

Defendant John Andries is one of many charged with committing federal crimes during

the breach of the United States Capitol on January 6, 2021.  He moves to dismiss part of the

Superseding Indictment filed against him on the ground that three of the charged counts are

legally deficient.  Count I alleges that Andries obstructed an "official proceeding" in violation of

18 U.S.C. § 1512(c)(2), but Andries says the January 6 joint session of Congress to count and

certify the electoral votes was not an official proceeding within the meaning of the statute.

Alternatively, he argues that 18 U.S.C. § 1512(c)(2) is unconstitutionally vague under the Due

Process Clause of the Fifth Amendment.  Next, he claims that Counts II and III, which allege

various unlawful activities in a restricted area that the Vice President was "temporarily visiting"

in violation of 18 U.S.C. § 1752, must be dismissed because the Capitol Police (rather than the

Secret Service) restricted the Capitol grounds on January 6 and because then-Vice President

Pence was not "temporarily visiting" the Capitol that day.  Andries's as-applied vagueness

challenge to § 1512(c)(2) is premature at the motion-to-dismiss stage, and each of his other

claims is incorrect as a matter of law.  The Court denies Andries's motion to dismiss Counts I, II, and III of the Superseding Indictment.

## II.  BACKGROUND[1]

The Twelfth Amendment to the United States Constitution requires the President of the Senate—a position held by the Vice President, U.S. Const. art. I, § 3, cl. 4—to receive lists recording the votes of the Electoral College for President and to open and count them in the presence of the Senate and the House of Representatives.  U.S. Const. amend. XII.  In the Electoral Count Act of 1887, Congress added some detail to this constitutional procedure.  That statute requires the Senate and House to gather in the Hall of the House of Representatives at 1:00 p.m. on the sixth day of January after each meeting of the electors.  3 U.S.C. § 15.  The President of the Senate then must open each state's certificate reflecting its electoral vote and announce the state's vote.  *Id.*  Members of Congress may object to any state's vote in writing. *Id.*  If at least one member of the House and one Senator sign an objection, the Senate and House gather separately to consider it.  *Id.*  An individual Senator or Member of the House may speak for up to five minutes regarding the objection; in all events debate on an objection may last no more than two hours in each House.  *Id.* § 17.  The statute provides for the scope and disposition of various potential objections; for example, "no electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been lawfully certified to

---

[1] Other than those taken from the Superseding Indictment, the facts recounted in this section are for background only.  The Court does not rely on them for its legal analysis of Defendant's Motion to Dismiss, which must turn only on "the four corners of the indictment." *United States v. Montgomery*, No. CR 21-46, 2021 WL 6134591, at *2 n.1 (D.D.C. Dec. 28, 2021) (citation omitted).  Nor does the Court purport to find any facts; that task will rest with the jury.  *Id.*  As explained below, the Court will assume for purposes of its legal analysis of Defendant's Motion to Dismiss that the facts alleged in the Superseding Indictment are true.

according to [the statute] from which but one return has been received shall be rejected, but the two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified." *Id.* § 15.

At 1:00 p.m. on January 6, 2021, both houses of Congress, as well as then-Vice President Mike Pence, convened in a joint session in the Hall of the House of Representatives to carry out their constitutional and statutory duty "to certify the Electoral College vote in the 2020 presidential election." *Montgomery*, 2021 WL 6134591, at *2. Vice President Pence was, of course, under Secret Service Protection. Gov't's Opp'n Def.'s Mot. Dismiss Counts One, Two, and Three of the Superseding Indictment at 2 ("Opp'n"), ECF No. 22. And the United States Capitol Police, the agency responsible for security at the United States Capitol and its grounds, had cordoned off an area around the Capitol with metal barriers, fencing, and signs saying that the area was closed. Opp'n at 2–3; *see* Superseding Indictment at 2, ECF No. 15.

About thirty minutes into the session, certain members of Congress lodged an objection to Arizona's vote; the Senate withdrew to its chambers so that the two Houses could consider the objection. *Montgomery*, 2021 WL 6134591, at *2. Meanwhile, then-President Trump and others spoke at a "Stop the Steal" rally in protest of the election results. *See United States v. Munchel*, 991 F.3d 1273, 1275 (D.C. Cir. 2021). As is by now well known, a crowd, including attendees of the rally, advanced toward the Capitol. *See Montgomery*, 2021 WL 6134591, at *2. A large group massed on the steps outside the Capitol building. Opp'n at 3.

According to a grand jury's Superseding Indictment, Defendant John D. Andries was among this crowd. Superseding Indictment at 1–3. The government alleges that Andries entered the restricted Capitol area and engaged in disorderly or disruptive conduct there aimed at disrupting the certification proceeding. *Id.* Beyond that, the Superseding Indictment provides

little detail about exactly what Andries allegedly did at the Capitol on January 6.  It does,

however, charge him with obstruction of an official proceeding and aiding and abetting in

violation of 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 2 (Count I); entering and remaining in a

restricted building and grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count II); disorderly and

disruptive conduct in a restricted building and grounds, in violation of 18 U.S.C. § 1752(a)(2)

(Count III); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D)

(Count IV); and parading, demonstrating, or picketing in a Capitol building, in violation of 40

U.S.C. § 5104(e)(2)(G) (Count V).  *Id.*

 Andries moved to dismiss Count I, Count II, and Count III under Federal Rule of

Criminal Procedure Rule 12(b)(3)(v).  Def.'s Mot. Dismiss Counts One, Two, and Three of the

Superseding Indictment ("Def.'s Mot. Dismiss"), ECF No. 20.  The Court heard oral argument

on October 5, 2021, and the parties filed several supplemental briefs adding or expanding upon

arguments thereafter.

### III.  LEGAL STANDARD

 "An indictment's main purpose is to inform the defendant of the nature of the accusation

against him."  *United States v. Ballestas*, 795 F.3d 138, 148–49 (D.C. Cir. 2015) (cleaned up).

Thus, the Federal Rules of Criminal Procedure require only that the indictment include "a plain,

concise, and definite written statement of the essential facts constituting the offense charged."

Fed. R. Crim. P. 7(c).  A defendant may move to dismiss counts of an indictment for "failure to

state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(v).  A court considering such a motion must

"assume[] the truth of th[e] factual allegations" in the indictment.  *Ballestas*, 795 F.3d at 149.

Indeed, the court's review is limited to "the four corners of the indictment."  *United States v.

Ring*, 628 F. Supp. 2d 195, 204 (D.D.C. 2009).  This limitation "affords deference to the

'fundamental role of the grand jury.'" *United States v. Mostofsky*, No. CR 21-138, 2021 WL 6049891, at *2 (D.D.C. Dec. 21, 2021) (quoting *Ballestas*, 795 F.3d at 148). "Adherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury." *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001). "A court accordingly cabins its analysis to the face of the indictment and, more specifically, the language used to charge the crimes." *Mostofsky*, 2021 WL 6049891, at *2 (cleaned up).

## IV.  ANALYSIS

### A.  Count I, for Violation of 18 U.S.C. § 1512(c)(2), States an Offense

Count I charges that Andries "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18." Superseding Indictment at 1. According to the government, this violated 18 U.S.C. § 1512(c)(2), which reads:

> (c) Whoever corruptly—
>
> > (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
> >
> > (2) **otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so**,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512 (emphasis added). "Official proceeding" is defined in a subsequent section to include "a proceeding before Congress":

> (a) As used in sections 1512 and 1513 of this title and in this section--
>
> > (1) the term "official proceeding" means--

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) **a proceeding before the Congress**;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce . . . .

18 U.S.C. § 1515(a) (emphasis added).  Andries advances two reasons for his claim that Count I fails to state an offense.  First, he says that "[t]he Electoral Count on January 6 is not an 'official proceeding,'" and, therefore, any obstruction of the meeting would be beyond the scope of 18 U.S.C. § 1512(c)(2).  Def.'s Mot. Dismiss at 6–7 (cleaned up).  Second, he argues that "even if the Court determines that the Electoral Count is an 'Official Proceeding,' 18 U.S.C. §1512(c)(2) is unconstitutionally vague as applied . . . ."  *Id.*at 9 (cleaned up); *see United States v. Eshetu*, 863 F.3d 946, 952 (D.C. Cir. 2017), *vacated on other grounds*, 898 F.3d 36 (D.C. Cir. 2018) ("The defense of failure of an indictment to charge an offense includes the claim that the statute apparently creating the offense is unconstitutional.").  The Court rejects the statutory argument; it also rejects the vagueness argument to the extent it challenges the statute on its face.  To the extent Andries raises an as-applied vagueness challenge, the Court holds that the claim is premature because its resolution would depend on facts not included in the Superseding Indictment.  Therefore, the Court denies Andries's motion to dismiss Count I.

1.   The Electoral Count is an "Official Proceeding"

Andries's argument that the January 6 congressional count of electoral votes was not an "official proceeding" rests, as a first step, on assertions regarding 18 U.S.C. § 1512(c)(2)'s purpose and legislative history.  Andries notes that Congress added § 1512(c)(2) as part of the Sarbanes-Oxley Act of 2002, "legislation designed to protect investors and restore trust in financial markets following the collapse of Enron Corporation," which involved Enron's auditor's "systematic[] destr[uction] [of] potentially incriminating documents" related to accounting fraud.[2]  *Yates v. United States*, 574 U.S. 528, 532, 536–37 (2015); *see United States v. Caldwell*, No. 21-CR-28, 2021 WL 6062718, at *5 (D.D.C. Dec. 20, 2021); Def.'s Mot. Dismiss at 4–5.  Andries further relies upon cases holding that a definition of "official proceeding" *separate* from the "proceeding before the Congress" definition that applies here—"a proceeding before a Federal Government agency which is authorized by law," 18 U.S.C. § 1515(a)(1)(C)—does or does not encompass various types of federal agency investigations depending on the investigation's level of formality.  *Compare United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (Bureau of Prison review panel procedure which involved the determination of whether there had been a policy violation, the issuance of findings, and a decision on whether to refer the matter to senior authorities, and was therefore "quasi-adjudicative," was "sufficiently formal" to constitute an "official proceeding") *with United States v. Ramos*, 537 F.3d 439, 462–63 (5th Cir. 2008) (informal Border Patrol internal investigation

---

[2] Notably, however, § 1515, the section defining "official proceeding" to mean, among other things, "a proceeding before the Congress," "dates to the Victim and Witness Protection Act of 1982, Pub. L. No. 92-291, § 4(a), 96 Stat. 1248, 1252."  *United States v. McHugh*, No. CR 21-453, 2022 WL 296304, at *8 n.9 (D.D.C. Feb. 1, 2022).  Therefore, "Sarbanes Oxley is almost entirely irrelevant to the interpretation of the phrase 'a proceeding before the Congress.'" *Id.*

was not an "official proceeding" because "§ 1515(a)(1)(C) uses the preposition 'before' in connection with the term 'Federal Government agency,' which implies that an 'official proceeding' involves some formal convocation of the agency in which parties are directed to appear, instead of any informal investigation conducted by any member of the agency") *and United States v. Ermoian*, 752 F.3d 1165, 1171–72 (9th Cir. 2013) (FBI investigation was not an "official proceeding" in part because various surrounding sections of § 1512 refer to preventing witness testimony or attendance, preventing production of records or documents, and being absent from a proceeding to which one has been summoned by legal process, all of which "implie[d]" to the court "that some formal hearing before a tribunal is contemplated" in the term "official proceeding"); *see* Def.'s Mot. Dismiss at 5–6.

From this context, Andries concludes that § 1512(c)(2) is a "'witness tampering' statute" such that "'official proceeding before the Congress' contemplates the same type of 'adversarial nature' as court proceedings where there is a potential for witnesses to be influenced or documents to be destroyed"; in other words, "the obstruction must concern a proceeding involving adjudicative or at least 'quasi-adjudicative responsibilities.'"  Def.'s Mot Dismiss at 5–6 (quoting *Perez*, 575 F.3d at 169).  In the second step of his argument, Andries claims that the electoral count is a ceremonial formality, rather than "an adjudicative proceeding involving witness testimony and evidence."  Def.'s Mot. Dismiss at 7.

Andries's conclusion that an "official proceeding" must be an adjudicative proceeding skips several key stages of any sound interpretive analysis.  For one thing, it does not begin with the text of the statute.  Recall that Congress defined "official proceeding" as used in § 1512(c)(2) to mean, in relevant part, "a proceeding before the Congress."  18 U.S.C. § 1515(a)(1)(B).  The term "'proceeding' may be used . . . in a general sense to mean '[t]he carrying on of an action or

series of actions; action, course of action; conduct, behavior." *Ermoian*, 752 F.3d at 1169 (citing *Proceeding*, Oxford English Dictionary, https://www.oed.com/view/Entry/151779?rskey=A9Qmdo&result=2&isAdvanced=false#eid (last visited Mar. 14, 2022)).  The government suggests that this broad lay definition might be appropriate, Opp'n at 7–8, but the Court concludes that the narrower legal definition is a better interpretive fit.  *Ermoian*, 752 F.3d at 1170 (holding that the legal definition applies based on the modifier "official" and on the statute's repeated use of terms associated with the legal sphere, including "Congress"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 73 (2012) ("[W]hen law is the subject, ordinary legal meaning is to be expected, which often differs from common meaning.").  In the legal sense, "proceeding" means "[t]he business conducted by a court or other official body; a hearing." *Proceeding*, Black's Law Dictionary (11th ed. 2019).[3]  Congress, when convened in the form of the joint electoral count session mandated by the Electoral Count Act, is plainly an "official body"; the certification of electoral votes is its "business" assigned by the Electoral Count Act and the Twelfth Amendment.  *Caldwell*, 2021 WL 6062718, at *4.

Of course, ascertaining the meaning of "proceeding" takes us only so far; the statute also requires that the proceeding be "*before* the Congress," 18 U.S.C. § 1515(a)(1)(B) (emphasis added), and of course, that the proceeding be "official," *id.* § 1512(c)(2).  These modifiers reinforce the application of the narrow definition of "proceeding" and clarify the requirement

---

[3] To be sure, there are legal definitions of proceeding that are narrower still, such as "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment" or "[a]ny procedural means for seeking redress from a tribunal or agency." *Proceeding*, Black's Law Dictionary (11th ed. 2019).  But these plainly cannot have been the definitions Congress had in mind when it wrote of "a proceeding before the Congress," because Congress does not adjudicate lawsuits, is not an "agency," and does not hold any "tribunal[s]" (with the possible limited exceptions of impeachment and judging the qualifications of its own members, discussed below).

that the relevant proceeding be a "formal convocation" of the relevant entity (here Congress), as opposed to some informal action in which the entity or its members engage.  *Cf. Ramos*, 537 F.3d at 562 (interpreting the phrase "a proceeding before a Federal Government agency which is authorized by law," 18 U.S.C. § 1515(a)(1)(C)); *see Montgomery*, 2021 WL 6134591, at *5 (relying in part on the fact that "official proceeding before the Congress" appears as part of a definitional list referring to proceedings before a judge or court, a federal agency, and insurance regulatory agencies and examiners); *United States v. Sandlin*, No. 21-CR-88, 2021 WL 5865006, at *3 (D.D.C. Dec. 10, 2021) (citing *Official*, def. 5, Oxford English Dictionary (3d ed. 2004) to note that "official" means "formal" and "ceremonious").  So, to sum up, a "proceeding before the Congress" is a formal convocation at which Congress has convened to conduct its official business.

Thus, a vote on pending legislation is likely "a proceeding before the Congress," as is a committee hearing at which sworn witnesses appear; an individual member's hosting of a meeting of constituents in her office might not be.  The Court need not delineate the precise contours of formality necessary to constitute an official proceeding to resolve this case, nor need it decide precisely what does and does not count as Congress's official business: any reasonable understanding of these concepts would include the joint electoral count session.  As Judge Friedrich recently explained, there is a wealth of indicators that the electoral count session is a formal convocation for the carrying out of Congress's official business:

> The Constitution requires the Vice President, acting as President of the Senate, to "open all the certificates" of the electoral results "in the presence of the Senate and House of Representatives."  U.S. Const., art. II, § 1, cl. 3; *id.* amend. XII.  The "votes shall then be counted."  *Id.*  The Electoral Count Act, Pub. L. No. 45-90, 24 Stat. 373 (1887), specifies the procedures to be followed.  A Joint Session of the Senate and the House of Representatives must meet "at the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15.  The presiding officer (the President of the Senate) opens the

certificates of the electoral votes and hands them to tellers appointed by each House, who make a list of the votes.  *Id.*  When announcing each certificate, the presiding officer calls for objections, if any, which must be made in writing and signed by both one Senator and one Member of the House of Representatives.  *Id.*  Thereafter, the Senate and the House withdraw to consider each objection, and "each Senator and Representative may speak to such objection or question five minutes, and not more than once."  *Id.* § 17.  The presiding officer must cut the debate off after two hours.  *Id.*  He also has the "power to preserve order" during the session.  *Id.* § 18.  The Act details where the presiding officer, the Speaker, the Senators, the Representatives, the tellers, and others are to sit in the chamber.  *Id.* § 16.  And it commands that the session "not be dissolved until the count of electoral votes shall be completed and the result declared."  *Id.*

*Sandlin*, 2021 WL 5865006, at *4.[4]

---

[4] Judge Bates recently concluded that the word "before" does more than denote a formal convocation; it also means that "a second party must be integrally involved in the 'proceeding' in order for it to be 'before' the Congress."  *McHugh*, 2022 WL 296304, at *5 (concluding that the January 6th certification met this qualification, because though not physically present, the members of the Electoral College are external parties integrally involved in the proceeding because their votes are certified at the proceeding).  Judge Bates's well-reasoned opinion relied in part on *Ramos*, 537 F.3d at 462–463 (the use of "before" "implies that an 'official proceeding' involves some formal convocation of the agency *in which parties are directed to appear*" (emphasis added) and *Ermoian*, 752 F.3d at 1171 ("The use of the preposition 'before' suggests an appearance in front of the agency sitting as a tribunal . . . . [A] criminal investigation does not occur 'before a Federal Government agency' like a hearing or trial might; it is conducted 'by' the agency in the field").  However persuasive this interpretation of "before" may have been in the context of the "proceeding before a Federal Government agency which is authorized by law" definition at issue in *Ramos* and *Ermoian*, the Court concludes that Congress could not have intended "before" to require a second party external to Congress in the context of "a proceeding before the Congress."  This is because, as Judge Moss has explained, Congress routinely uses the word "before" to describe congressional proceedings that do not involve an external party:

> To take an example from the year Congress enacted Section 1515, a markup was held "*Before* the Committee on Foreign Affairs" on six resolutions concerning human rights in the former Soviet Union.  *H. Res. 200; H. Con. Res. 218; H.J. Res. 230; H. Con. Res. 205; H.J. Res. 373; H. Res. 269: Markup Before the H. Comm. on Foreign Affs. and its Subcomm. on Human Rts. & Int'l Orgs.*, 97th Cong. I (1982) (emphasis added).  Although that proceeding took place *before* the Committee, "no witnesses" appeared.  *Id.* at III.  That example, moreover, is far from unusual; proceedings often occur "*before*" congressional committees and without witnesses or "parties."  *See, e.g., Markup to Consider Three Joint Resolutions Relating to Lebanon and the War Powers Resolution: S.J. Res. 159; S.J. Res. 163; and S.J. Res. 166: Hearing Before the S. Comm. on Foreign Rels.*, 98th Cong. I (1983); *NASA Management Reorganization Act of 1993: Markups Before the H. Comm. on Sci., Space & Tech.*, 103rd Cong. I (1993).

Notably, this analysis of the text and immediate context yields nothing to suggest that "a proceeding before the Congress" must be adjudicative in nature. Indeed, such a requirement would be "inconsistent" with the text "proceeding before *the Congress*." *McHugh*, 2022 WL 296304, at *8. The reason is simple: Congress hardly ever adjudicates. *See Adjudicate*, Oxford English Dictionary, https://www.oed.com/view/Entry/2456?redirectedFrom=adjudicate#eid (last visited Mar. 24, 2022) (defined most broadly, "adjudicate" means "[t]o settle, determine, or decide judicially, or by a similar legal or official process. Also more generally: to judge; to act as a referee in."). Congress gathers information and then votes on legislation; it can hardly be said to "adjudicate" the bills before it. "As a matter of separation of powers, that is not what Congress does. To be sure, Congress's legislative powers include the implicit authority to summon witnesses, to elicit testimony, and to investigate facts about the world. In other words, 'each House has power to secure needed *information in order to legislate*.'" *Montgomery*, 2021 WL 6134591, at *7 (quoting *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (emphasis added in original and internal quotation marks omitted)). "Section 1515(a)(1) reaches all three branches of government, and the definition of 'official proceeding' is properly understood in the unique context of each branch." *Id.* Thus, even assuming the soundness of conclusions like those in *Perez*, 575 F.3d at 169, i.e. that "quasi-adjudicative responsibilities" are at least sufficient to meet the § 1515(a)(1)(C) definition relevant to executive branch agencies—whose responsibilities frequently do involve adjudication—they cannot fully define "proceeding before the Congress" in § 1515(a)(1)(B). *Cf. United States v. Kelley*, 36 F.3d 1118, 1127–28 (D.C. Cir. 1994) (holding that an administrative investigation was a "proceeding" within the

---

*Montgomery*, 2021 WL 6134591, at *8. The Court agrees with Judge Moss that "Congress undoubtedly understood this common usage—that is, its own usage—when it enacted Section 1515(a)(1)." *Id.*

12

meaning of 18 U.S.C. § 1505 because the agency inspector had "some adjudicative power" in that he could "issue subpoenas and . . . compel sworn testimony," and assuming without deciding that "proceeding" in § 1505 and in § 1512 carried the same meaning).  With the exception of those rare instances in which Congress might be said to adjudicate, namely impeachments and when judging the qualifications of its own members, *Montgomery*, 2021 WL 6134591, at \*7 (citing U.S. Const. art. I, § 2, cl. 5; *id.* art. I, § 3, cl. 6; *id.* art. I, § 5, cl. 1), understanding "proceeding before the Congress" to refer solely to adjudicative proceedings would make the definition "something close to a null set," *McHugh*, 2022 WL 296304, at \*8.  If that were what Congress wanted, it would have been far easier simply to prohibit obstruction of impeachment or qualification proceedings.  The Court will not assume that Congress intended to enact such a narrow provision by using such broad language.

Even a softer read of Andries's proposed interpretation—perhaps a "proceeding before the Congress" need not be adjudicative in the sense just described, but still must involve a proceeding "where there is a potential for witnesses to be influenced or documents to be destroyed," Def.'s Mot. Dismiss at 5—finds no support in the text, and weakens further when faced with broader statutory context.  Andries says that an "official proceeding," in the congressional context, must be akin to a hearing, and that the electoral count does not qualify because it is "ceremonial and predetermined in nature."  Def.'s Second Suppl. Br. Supp. Mot. Dismiss Counts One, Two, and Three of the Superseding Indictment at 2 ("Def.'s Second Suppl. Br."), ECF No. 39.  But this emphasis on Congress's and the Vice President's lack of discretion in certifying the electoral vote does not answer the question asked by the Court's interpretation of "proceeding before the Congress" to mean a formal convocation of Congress for the purpose of conducting its official business.  Congress's electoral count authority surely is limited, *see* 3

U.S.C. § 15, but this does not change the fact that the electoral count is a constitutionally and statutorily mandated formal convocation of a joint session of Congress for the purpose of conducting the official, constitutionally-assigned business of certifying the electoral vote.

Andries relies heavily on the Black's Law Dictionary definition of "proceeding" quoted above: "[t]he business conducted by a court or other official body; *a hearing*."  *Proceeding*, Black's Law Dictionary (11th ed. 2019) (emphasis added).  But this definition lists a hearing as one example of a broader category of official body business; "a hearing" is not the entire definition.  Contrast Black's Law Dictionary's separate entry for "Adjudicatory Proceeding," which reads entirely "See *adjudication hearing* under [the entry for] HEARING."  *Adjudicatory Proceeding*, Black's Law Dictionary (11th ed. 2019); *see Hearing*, Black's Law Dictionary (11th ed. 2019) (defining "adjudication hearing" to include certain types of administrative agency, child abuse, and juvenile delinquency hearings).  This structure makes clear that not every "proceeding" is an adjudication or a hearing.  Andries also notes that 3 U.S.C. § 15 describes the electoral count as a "meet[ing]," which to him suggests a category distinct from "proceeding." Def.'s Second Suppl. Br. at 3.  But as the Court has explained, "a proceeding before Congress" is a formal convocation of Congress for the purpose of conducting official business—in other words, a type of meeting.  Finally, Andries briefly points out that the Constitution uses the term "proceeding" in relation to Congress only to refer to actions taken by individual Houses, not the House and Senate together.  *Id.*, U.S. Const. art. I, § 5, cl. 2–3 ("Each House may determine the Rules of its Proceedings . . . Each House shall keep a Journal of its Proceedings").  But nothing about the Constitution's usage suggests that "proceeding" must refer exclusively to actions solely within one House, rather than being merely inclusive of them.

Unlike adjudications, Congress does frequently hold investigative hearings at which witnesses appear.  But a nearby provision shows that Congress would have known how to limit its definition to such proceedings if it wished.  Section 1505 criminalizes the obstruction of "the due and proper exercise of the power of inquiry under which an inquiry or investigation is being had by either the House, or any committee of either House or any joint committee of the Congress."  18 U.S.C. § 1505; *see Caldwell*, 2021 WL 6062718, at *5 (noting that "[t]his has been part of the U.S. Code since at least 1962").  But instead of drafting a provision targeted at investigative hearings for inclusion in § 1515(a)(1) (and, by reference, § 1512(c)), Congress used the much broader terms "official proceeding" and "proceeding before the Congress."  18 U.S.C. §§ 1512(c), 1515.  The Court will not limit the statute in a way Congress chose not to.  *See Caldwell*, 2021 WL 6062718, at *5; *United States v. Nordean*, No. CR 21-175, 2021 WL 6134595, at *5 (D.D.C. Dec. 28, 2021); *Montgomery*, 2021 WL 6134591, at *6.

In sum, the Court holds that a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(C), extends to formal convocations of Congress for the purpose of conducting official business, *see Montgomery*, 2021 WL 6134591, at *9, and that the January 6th, 2021 joint session of Congress to certify the electoral vote was such a proceeding.  Andries's assertions about purpose and legislative history are not persuasive; even if they were, they could not override the unambiguous plain meaning of the statute in context.[5]  Because the Court does not agree with Andries that a "proceeding before the Congress" must be adjudicative in nature, the

---

[5] Andries briefly alludes to the rule of lenity, Def.'s Mot. Dismiss at 2, but the Court's conclusion that the terms "official proceeding" and "proceeding before the Congress" unambiguously do not require the sort of adjudication or hearing Andries envisions precludes application of that rule here.  The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended."  *Nordean*, 2021 WL 6134595 at *12 (quoting *Barber v. Thomas*, 560 U.S. 474, 488 (2010)).

Court need not address the second step of Andries's argument, that the electoral count proceeding is not adjudicative.  The Court does note, however, that other judges in this District have confronted similar arguments and held, as an alternative to concluding that a "proceeding before the Congress" need not be adjudicative, that the electoral count is in some sense adjudicative because it may involve the consideration of and decisions on disputed objections. *Caldwell*, 2021 WL 6062718, at *7; *Nordean*, 2021 WL 6134595, at *6.  The Court denies Andries's motion to dismiss Count I to the extent it relies on the theory that the January 6th electoral count was not an "official proceeding."

2.  Section 1512(c)(2) is Not Void for Vagueness under the Fifth Amendment, and Andries's As-Applied Vagueness Claim is Premature

Andries alternatively attacks the Count I charge on the ground that the terms "corruptly," "otherwise obstructs, influences, or impedes," and "official proceeding" in 18 U.S.C. § 1512(c)(2) are unconstitutionally vague under the Due Process Clause of the Fifth Amendment. Def.'s Mot. Dismiss at 9–14.  The Fifth Amendment imposes a clarity requirement on criminal statutes, requiring Congress to "give ordinary people fair notice of the conduct [a law] punishes" and to include sufficient standards so that the law does not "invite[] arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  "[T]he touchstone is whether the statute, either standing alone *or as construed*, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *United States v. Lanier*, 520 U.S. 259, 267 (1997) (emphasis added).  Thus, "clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute."  *Lanier*, 520 U.S. at 266; *see also United States v. Morison*, 844 F.2d 1057, 1071 (4th Cir. 1988) ("[A]ll vagueness may be corrected by judicial construction which narrows the sweep of the statute within the range of reasonable certainty.").  Moreover, the Constitution does not require absolute precision of language.  The Fifth Amendment is "not concerned with

vagueness in the sense that the term requires a person to conform his conduct to an imprecise but comprehensible normative standard, whose satisfaction may vary depending upon whom you ask.  Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning specifies no standard of conduct at all." *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (cleaned up).  "[T]he 'mere fact that close cases can be envisioned' does not 'render[ ] a statute vague'—'[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is.'" *Montgomery*, 2021 WL 6134591, at *18 (quoting *United States v. Williams*, 553 U.S. 285, 305–06 (2008)).

Andries has briefed only an as-applied vagueness claim.  Def.'s Mot. Dismiss at 9; Def.'s Second Suppl. Br. at 5; Def.'s Reply Gov't Resp. Mot. Dismiss Counts One, Two, and Three of the Superseding Indictment at 4–7 ("Reply"), ECF No. 23.  At oral argument, however, defense counsel asserted that 18 U.S.C. § 1512(c)(2) was vague on its face.  As explained below, the Court concludes that an as-applied challenge is premature at the motion-to-dismiss stage in this case.  The Court further holds that Andries forfeited his opportunity to bring a facial vagueness challenge by failing to brief such a claim.  *See United States v. Pole*, No. 09-cr-354, 2021 WL 5796518, at *6 (D.D.C. Dec. 7, 2021); *United States v. Johnson*, No. 02-cr-310, 2021 WL 3737681, at *4 (D.D.C. Aug. 24, 2021).  Out of an abundance of caution, and to avoid the harshness of relying on forfeiture alone to deny a criminal defendant the chance to argue that he is being prosecuted under an unconstitutional statute, the Court alternatively addresses the merits of the facial vagueness claim and holds that it fails.  Accordingly, the Court denies Andries's motion to dismiss Count I of the Superseding Indictment.

*The as-applied vagueness challenge is premature.*  Recall that the Court's review at the Rule 12 motion-to-dismiss stage is limited to 'the four corners of the indictment,'" *Ring*, 628 F. Supp. 2d at  204, and that the indictment in this case is not a "speaking indictment."  It does not tell us exactly how the government intends to prove that Andries "obstruct[ed], influenc[ed] and imped[ed]" Congress's certification of the electoral vote[6] or how the government hopes to prove that he did so "corruptly."  Superseding Indictment at 1; 18 U.S.C. § 1512(c)(2).  "For an as-applied challenge, an 'implicit requirement' is 'that it must be clear what the defendant did.'" *United States v. Reffitt*, No. 21-cr-32, Dkt. No. 81, slip op. at 5 (D.D.C. Dec. 29, 2021) (quoting *United States v. Raniere*, 384 F. Supp. 3d 282, 320 (E.D.N.Y. 2019)).  Count I alleges what Andries did only in the broadest sense.  It says he "attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18."  Superseding Indictment at 1.  In its brief opposing the motion to dismiss, the government contends, without citation, that Andries entered the Capitol through a broken window, pulled or attempted to pull the fire alarm, "confronted law enforcement officers inside the building[,] and refused to leave the Capitol grounds, forcing officers to physically remove him."  Opp'n at 4–5, 19.  But these details do not help an as-applied analysis at this stage, as the Court may not consider unsupported allegations in a brief when deciding a Rule 12 motion to dismiss.  *See Reffitt*, slip op. at 6 (refusing to consider government's claim in a brief that the defendant "charged at officers with the intent to obstruct"

---

[6] To the extent Andries's as-applied challenge asserts that the term "official proceeding" is unconstitutionally vague, it is ripe and fails on the merits.  *See* Def.'s Mot. Dismiss at 10.  As the Court has explained, the January 6th electoral count Andries is charged with obstructing unambiguously was an "official proceeding."

the electoral count proceeding when evaluating a motion-to-dismiss as-applied vagueness challenge to a § 1512(c)(2) charge).  Put differently, Andries disputes at least some of the allegations found in the government's brief.  Def.'s Second Suppl. Br. at 7 n.3 ("[T]here is no evidence that [Andries] pulled the fire alarm.").  The Court must accept the allegations *in the Superseding Indictment* as true for purposes of this Rule 12 motion, but it may not replace the jury as the decider of factual disputes between the parties.  *See Ballestas*, 795 F.3d at 149.

The facts that the Court must accept as true at this stage—those in the Superseding Indictment—are insufficient to resolve Andries's as-applied vagueness challenge one way or the other.  As the Court will explain, 18 U.S.C. § 1512(c)(2) applies with clarity to a certain range of conduct, but "there may be scenarios at the edges that present vagueness problems."  *Sandlin*, 2021 WL 5865006, at *10.  Without any specific facts in the Superseding Indictment, the Court cannot evaluate whether Andries's conduct fell closer to the clear core or the vaguer edges of the statute's coverage, and, accordingly, whether he had "fair notice," *Johnson*, 576 U.S. at 596, that his conduct violated § 1512(c)(2).  "Rule 12 permits pretrial resolution of a motion to dismiss the indictment only when trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense."  *Reffitt*, slip op. at 6 (quoting *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.)).  Because the Court would need more facts to pass upon an as-applied vagueness challenge, it denies Andries's as-applied vagueness challenge to Count I as premature.  *Compare Sandlin*, 2021 WL 5865006, at *14 (reaching the merits of a motion-to-dismiss as-applied vagueness challenge to § 1512(c)(2) charges where the indictment "allege[d] that the defendants engaged in advance planning, forcibly breached the Capitol building, assaulted Capitol police officers, and encouraged others to steal laptops and paperwork from the Senate Chamber") *with Reffitt*, slip op. at 6 (denying a

19

motion-to-dismiss-as-applied vagueness challenge as premature because the court could not determine whether the defendant had sufficient notice "based on the indictment alone," which, as supplemented by a Bill of Particulars, alleged only that the defendant violated § 1512(c)(2) "by stopping, or attempting to stop, the [electoral count] proceeding from going forward on time, with the members of Congress present and able to examine the electoral results"); *see United States v. Kettles*, No. CR 16-00163-1, 2017 WL 2080181, at *3 (M.D. Tenn. May 15, 2017) ("In considering [the defendant's] motion to dismiss the indictment . . . the court cannot make any determinations regarding the facts underlying the offense . . . The court cannot determine the nature and extent of [the defendant's] conduct in this case and, therefore, also cannot determine whether [18 U.S.C.] § 1591(a) is void for vagueness as applied to that conduct."), *aff'd*, 970 F.3d 637 (6th Cir. 2020); *Raniere*, 384 F. Supp. 3d at 320 (holding that the defendant had to "wait to bring an as-applied vagueness challenge [to an 18 U.S.C. § 1591(a) charge] until the facts ha[d] been established by evidence introduced at trial and the fact-finder ha[d] had an opportunity to weigh in" (citation omitted)); *United States v. Poulin*, 588 F. Supp. 2d 58, 61–62 (D. Me. 2008) ("The Court must dismiss the as applied motion to dismiss, since it relies on facts not alleged in the Indictment and those facts constitutionally require resolution by a jury."); Gov't's Resp. Def.'s Second Suppl. Br. at 7, ECF No. 40 (requesting such a disposition in this case).

*As an alternative to the Court's holding that Andries forfeited the opportunity to present a facial vagueness challenge, a facial challenge fails on the merits.* It is difficult to mount a successful facial challenge on vagueness grounds. For many years, a litigant could prevail on a facial vagueness challenge only upon a showing that the law "is impermissibly vague in all of its applications." *Vill. of Hoffman Ests. v. Flipside, Inc.*, 455 U.S. 489, 495 (1982). The Supreme Court cast some doubt on this strict standard in *Johnson v. United States* when it highlighted

previous Supreme Court holdings to "contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." 576 U.S. at 602–03 (citing *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921), which held that a law banning "unjust or unreasonable" grocery rates was void for vagueness, even though one could surely imagine *some* rates that would be clearly unjust or unreasonable, such as "charging someone a thousand dollars for a pound of sugar"). Thus, *Johnson* held that "the existence of some" actions that "obviously" fell within the statutory clause at issue in *Johnson* did not "establish the . . . clause's constitutionality." *Id.* at 603. The D.C. Circuit has not "decid[ed] the full implications of *Johnson*." *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 736 (D.C. Cir. 2016); *see also Robinson v. District of Columbia*, 234 F. Supp. 3d 14, 19 (D.D.C. 2017). In one instance, the D.C. Circuit noted *Johnson*'s apparent departure from the *Hoffman* standard, but went on to reject a facial vagueness challenge because the claim fell "*far short* of the 'impermissibly vague in all of its applications'" standard. *Crooks v. Mabus*, 845 F.3d 412, 417 (D.C. Cir. 2016) (emphasis added). Thus, to the extent *Johnson* softened the *Hoffman* standard, the current standard holds that the mere existence of "some" actions that "obviously" fall within a statute's ambit does not establish its constitutionality. *See Johnson*, 576 U.S. at 603. But if a statute clearly applies to a great many actions, it is not invalid on its face. *United States v. Harriss*, 347 U.S. 612, 618 (1954) ("[I]f the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague even though marginal cases could be put where doubts might arise."); *see Crooks*, 845 F.3d at 417 (asking whether a challenged statute fell "*far short*" of the *Hoffman* standard). Another way of understanding the current standard is to return to the first principles of the vagueness doctrine: "[A] statute is unconstitutionally vague if, applying the rules for

interpreting legal texts, its meaning specifies no standard of conduct at all." *Bronstein*, 849 F.3d at 1107; *see United States Telecom Ass'n*, 825 F.3d at 736 (noting *Johnson* and holding that a statute passed vagueness muster "even if [the court did] not apply *Hoffman*'s elevated bar for facial challenges" because the statute "g[ave] sufficient notice to affected entities of the prohibited conduct").

As in *Crooks*, Andries's vagueness challenge to § 1512(c)(2) not only fails to show that the statute is impermissibly vague in all its applications, it "falls far short of" doing so. 845 F.3d at 417. The Court need not tarry long over Andries's argument that the term "official proceeding" is unconstitutionally vague. As the Court has explained, the term has a straightforward, readily discernible meaning, at least when defined by § 1515(a)(1)(B) to mean "a proceeding before the Congress": a formal convocation at which Congress has convened to conduct its official business. Contrary to Andries's suggestion in his brief, the fact that courts such as those in *Ramos* and *Ermoian* have had to engage in interpretive analysis to determine whether certain investigations qualify as official proceedings—and that this Court and others have had to do so to determine whether the January 6th electoral count proceeding was an official proceeding—does not render the statute vague. Def.'s Mot. Dismiss at 5, 11. "The need to examine statutory language, determine its meaning, and apply it to a specific factual situation is not evidence of a constitutionally defective statute—it is the ordinary work of judging in the age of statutes." *McHugh*, 2022 WL 296304, at *12 (citing *Williams*, 553 U.S. at 306).

Andries's assertion that the phrase "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so," 18 U.S.C. § 1512(c)(2), is an impermissibly vague "residual clause" fares no better. Def.'s Mot. Dismiss at 10. Andries's reliance on *Johnson* is misplaced. There, the Supreme Court held that the residual clause of 18 U.S.C.

§ 924(e)(2)(B)(ii)—which made a previous conviction a predicate for a sentence enhancement if it "is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*"—was unconstitutionally vague not because it was a catch-all clause that used the word "otherwise," but rather because of the uncertainty inherent in the phrase "serious potential risk" and the need to apply that term to "an idealized ordinary case of the crime" rather than to the actual facts of the case.  *Johnson*, 576 U.S. at 597–98 (emphasis added to highlight the unconstitutionally vague language).  Section 1512(c)(2) does not present those concerns.  It simply requires the application of terms with "noncontroversial" definitions (obstruct, impede, and influence) to the defendant's actions.  *See Montgomery*, 2021 WL 6134591, at *10 (collecting dictionary definitions to conclude that § 1512(c)(2) prohibits "coming in the way of, blocking, or holding up the business conducted by an official body").  And the term "otherwise" suggests that the statute prohibits obstructing, influencing, or impeding an official proceeding in any way; that is, in ways other than the destruction, alteration, mutilation, and concealment of documentary evidence prohibited in § 1512(c)(1).  *See Nordean*, 2021 WL 6134595, at *6–8; *Montgomery*, 2021 WL 6134591, at *11–18; *United States v. Petruk*, 781 F.3d 438, 447–48 (8th Cir. 2015).  Read this way, § 1512(c)(2) is a broad, catch-all prohibition—it reaches a wide range of obstructive actions— but it is not a vague one.[7]  Moreover, every court of appeals to have faced the question has interpreted § 1512(c)(2) to include a requirement that the obstructive act have a nexus with a

---

[7] In *United States v. Miller*, the court interpreted § 1512(c)(2) narrowly to reach only action taken "with respect to a document, record or other object."  No. 21-cr-00119, Dkt. No. 72, slip op. at 28 (D.D.C. Mar. 7, 2022).  Neither party has presented to the Court a position regarding whether Miller's narrow interpretation or the broader reading found in such cases as *Montgomery* and *Nordean* is correct, so the Court does not definitively decide that question today.  For now, it suffices to conclude that even the broader reading is not vague, and that *Miller*'s narrower reading, if correct, would only further mitigate any vagueness concern.

specific official proceeding.  *Montgomery*, 2021 WL 6134591, at * 20 (collecting cases).  This means that the "charged conduct must have the 'natural and probable effect of interfering with' an official proceeding and the accused must have 'know[n] that his actions [were] likely to affect' a particular proceeding." *Id.* (quoting *United States v. Aguilar*, 515 U.S. 593, 599 (1995)).  This narrowing gloss further insulates the catch-all clause from any facial vagueness concern.

Andries's most substantial challenge is to the statute's use of the word "corruptly," but this, too, ultimately falls short.  He relies heavily on *United States v. Poindexter*, 951 F.2d 369, 379–80 (D.C. Cir. 1991), in which the D.C. Circuit observed that "in the absence of some narrowing gloss," the term "corrupt" is vague in that it might be defined with reference to subjective terms whose meanings can vary according to the moral values of the beholder, such as "'depraved,' 'evil,' 'immoral,' 'wicked,' and 'improper.'"  *Poindexter* held that 18 U.S.C. § 1505's prohibition on "corruptly . . . influenc[ing], obstruct[ing], or imped[ing]" congressional inquiries was unconstitutionally vague as applied to a defendant who was accused of making false statements to Congress.  951 F.2d at 377, 386.  Several judges in this district have encountered similar arguments and have persuasively explained why *Poindexter*'s holding and reasoning were limited to the facts it confronted and do not support a conclusion that "corruptly" as used in § 1512(c) is unconstitutionally vague.  Importantly, *Poindexter* turned in significant part on the fact that "corruptly" is used transitively in § 1505—i.e., in the sense of corruptly causing another person to act—and the difficulty in applying such a term to a defendant who was accused of lying *himself.  Id.* at 379.  But § 1512(c) "favors an intransitive reading of the word 'corruptly,'" in that it focuses on how a defendant acts, not how he causes another person to act. *Nordean*, 2021 WL 6134595, at *10.  Rather than rehash the remaining details of *Poindexter*, the Court notes its agreement with its colleagues' analyses, the key points of which are that  "(1)

*Poindexter* turned on the specific language of 18 U.S.C. § 1505 and the specific charge in that case—that is, lying to Congress; (2) '[i]n the end, the [D.C. Circuit] did not conclude that "corruptly" [even as used] in [S]ection 1505 was "unconstitutionally vague as applied to all conduct;"' and (3) '[m]uch has transpired in the four decades that have passed since *Poindexter*.'" *Montgomery*, 2021 WL 6134591, at *18 (quoting *Caldwell* 2021 WL 6062718, at *8–10)); *see also Sandlin*, 2021 WL 5865006, at *11; *McHugh*, 2022 WL 296304, at *10; *Nordean*, 2021 WL 6134595, at *10; *Mostofsky*, 2021 WL 6049891, at *11.

Post-*Poindexter* developments include numerous judicial interpretations of the term "corruptly" in various obstruction statutes.  In *Arthur Andersen LLP v. United States*, the Supreme Court relied on dictionary definitions of "knowing" and "corrupt" to hold that the phrase "knowingly . . . corruptly persuad[e]" in 18 U.S.C. § 1512(b) required "conscious[ness] of wrongdoing."  544 U.S. 696, 705–06 (2005).  Dictionary definitions made clear to the Supreme Court that "corruptly" is "normally associated with wrongful, immoral, depraved, or evil."  *Id.*  The Supreme Court did not suggest that the phrase "knowingly . . . corruptly," defined to mean with "consciousness of wrongdoing," was vague.

*Arthur Andersen* is instructive, but does not fully resolve Andries's vagueness challenge to § 1512(c).  The Supreme Court's "consciousness of wrongdoing" interpretation turned in part on § 1512(b)'s inclusion of the word "knowingly," a word absent from § 1512(c).  *Arthur Andersen*, 544 U.S. at 705 n.9; *see United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013).  Moreover, the Court relied on dictionary definitions of "corrupt," including "wrongful, immoral, depraved, [and] evil," *Arthur Andersen*, 544 U.S. at 705, that might be susceptible to *Poindexter*'s observation that such terms "afford 'an almost boundless area for individual assessment of the morality of another's behavior.'"  *Poindexter*, 951 F.2d at 378 (D.C. Cir. 1991)

(citation omitted); *see Sandlin*, 2021 WL 5865006, at *12 (citing *Poindexter*, 951 F.2d at 379);

*Williams*, 553 U.S. 285 at 306 ("[W]e have struck down statutes that tied criminal culpability to

whether the defendant's conduct was 'annoying' or 'indecent'—*wholly subjective judgments*

without statutory definitions, narrowing context, or settled legal meanings." (emphasis added)).

Notably, however, *Arthur Andersen* did not adopt the most subjective of these

definitional terms, like "immoral, depraved, or evil"; instead, it interpreted corrupt to mean

"wrongful."  544 U.S. at 705–06 (to "knowingly . . . corruptly persuade" means to be "conscious

of *wrongdoing*" (emphasis added)).  And the courts of appeals have built upon this focus to

interpret "corruptly" in § 1512(c) narrowly: it requires "at least an 'improper purpose' and an

'intent to obstruct.'"  *Montgomery*, 2021 WL 6134591, at *21 & n.4 (collecting cases).

"Corruptly," imports, at least, an intent requirement because it is difficult to imagine how one

could obstruct a proceeding "wrongfully" without in the first place intending to obstruct the

proceeding.  *See United States v. McKibbins*, 656 F.3d 707, 711 (7th Cir. 2011) (explaining that

the intent requirement separates innocent from wrongful acts of obstruction).[8]  The additional

requirement, acting with an improper purpose, is a straightforward translation of acting

wrongfully.  *See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) ("corruptly"

means "with an improper purpose and to engage in conduct knowingly and dishonestly with the

specific intent to subvert, impede or obstruct the" relevant proceeding); *United States v. Gordon*,

---

[8] The government appears to agree that § 1512(c) requires specific intent to obstruct a
specific proceeding.  It writes that "[a] conviction under Section 1512(c)(2) requires proof that
'the natural and probable effect of the defendant's actions were to obstruct the official
proceeding; that he knew that his actions were likely to obstruct that proceeding; and that he
acted with the wrongful or improper purpose of delaying or stopping the official proceeding.'"
Gov't's Resp. Def.'s Second Suppl. Brief at 6; *see also Caldwell*, 2021 WL 6062718, at *11
(quoting government's statement in that case that "the term 'corruptly' requires the government
to prove that a defendant acted not only with intent to obstruct but also with 'consciousness of
wrongdoing'" (citation omitted)).

710 F.3d 1124, 1151 (10th Cir. 2013) (same); *cf.* 18 U.S.C. § 1515(b) (defining "corruptly" as used in § 1505 to mean "*acting with an improper purpose*, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." (emphasis added)).[9]  Construed to include a requirement of improper purpose, and despite the absence of the word "knowingly" to modify "corruptly," the definition of "corruptly" in § 1512(c) is substantially similar to the "consciousness of wrongdoing" definition the Supreme Court laid out in *Arthur Andersen*, 544 U.S. at 706.  *See Caldwell*, 2021 WL 6062718, at *11 (holding that "corruptly" in § 1512(c) requires proof that the defendant acted with consciousness of wrongdoing).

While narrower than the "boundless" definitions of "corruptly" underlying Andries's vagueness challenge, such as "immoral" and "depraved," Def.'s Mot. Dismiss at 11 (citation omitted), the "improper purpose" requirement might at first glance seem to risk the sort of subjective judgment that could create a vagueness problem.  But a closer look reveals that interpreting "corruptly" to require proof of an improper purpose sets out a "comprehensible normative standard," if an "imprecise" one—enough to pass vagueness muster.  *Bronstein*, 849 F.3d at 33.  *Arthur Andersen* explained that the "conscious of wrongdoing" definition worked to

---

[9] Courts have phrased the requirement in different ways, *see, e.g.*, *Friske*, 640 F.3d at 1291 (referring to "dishonest" conduct); *United States v. Edlind*, 887 F.3d 166, 174 n.3 (4th Cir. 2018) (noting district court's instruction which required the defendant to be "conscious of wrongdoing").  But the Court "need not adopt a firm definition of 'corruptly'" in order to resolve Andries's facial vagueness challenge.  *See Caldwell*, 2021 WL 6062718, at *11.  The Court's narrow task at this stage is to discern whether "corruptly" provides "no standard of conduct at all."  *Bronstein*, 849 F.3d at 1107.  Any remaining vagueness concerns come from the "improper purpose" requirement; additional terms such as "dishonestly" (if they are part of the definition at all) are clear enough, as is "intent to obstruct."  *See Caldwell*, 2021 WL 6062718, at *11 ("Defendants cannot complain that section 1512(c)(2) does not supply fair notice if it is construed to require proof that Defendants acted with a specific intent to do what the statute prohibits: obstruct an official proceeding.").

limit § 1512(b) so that it reached only "those with the level of culpability we usually require in order to impose criminal liability."  544 U.S. at 706 (cleaned up).  In the context of § 1512(b)'s prohibition on "knowingly . . . corruptly persuad[ing]" with the intent to cause a person to withhold documents from an official proceeding, *Arthur Andersen* explained that the statute drew a distinction between *lawful* persuasion to withhold documents and persuasion to withhold documents that was "inherently malign." 544 U.S. at 703–04.  Thus, "a mother who suggests to her son that he invoke his right against compelled self-incrimination, *see* U.S. Const., Amdt. 5, or a wife who persuades her husband not to disclose marital confidences" does not act with an improper purpose.  *See id.* at 704.  Nor is it improper for an attorney to persuade a client to withhold documents protected by the attorney-client privilege.  *See id.*  And, under "ordinary circumstances," it is "not wrongful for a manager to instruct his employees to comply with a valid document retention policy," including by shredding documents.  *See id.*

    "Corruptly" in § 1512(c)(2) serves the same function; it separates innocent attempts to "obstruct[], influence[], or impede" an official proceeding from those undertaken with a wrongful purpose.  *See McKibbins*, 656 F.3d at 711 ("'[C]orruptly' is what 'serves to separate criminal and innocent acts of obstruction'" in § 1512(c)).  Like the examples in *Arthur Andersen*, one can picture scenarios in which an individual attempts to "influence" (and maybe impede or obstruct) for a proper purpose.  *Cf. United States v. North*, 910 F.2d 843, 882 (D.C. Cir. 1990) (per curiam)  ("An executive branch official, for example, might call the chairman of a congressional committee convened to investigate some wrongdoing and say, 'We both know this investigation is really designed to embarrass the President (or a Senator), not to investigate wrongdoing.  Why don't you call it off'?  The official surely intends to obstruct or impede the inquiry, but it does not necessarily follow that he does so corruptly.  Similarly, a political activist

might contact his representative and tell her that unless she stops spending her time pursuing a certain investigation rather than some other legislative endeavor, the activist's group will oppose her reelection.  Again, the activist is endeavoring to impede or obstruct the investigation, but is not necessarily doing so corruptly"), *opinion withdrawn and superseded in nonrelevant part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990).  Notice that the proper examples explored in *Arthur Andersen* and *North* all involved the vindication of legal rights (the privilege examples) or the *pursuit of ends* widely recognized as acceptable or ordinary in the relevant field (the document retention policy and lobbying examples); they also involved *conduct* widely acceptable and ordinary in the relevant field.  Unusual or illegal conduct is a useful, if not necessary, indicator of improper purpose.[10]  *Cf. Sandlin*, 2021 WL 5865006 at *11 (in addition to covering normally legitimate actions undertaken with an improper purpose, the word "corrupt" also means "characterized by improper conduct (such as bribery or the selling of favors)" (quoting *Corrupt* (adj.), def. 1(b), Merriam-Webster's Collegiate Dictionary)).  On the other side of these examples, there are a great many possible situations in which an individual plainly acts with an improper purpose, such as one who bribes a member of Congress to stop a hearing that might uncover the individual's criminal wrongdoing, or one who threatens a member of Congress in order to delay a hearing so that the individual has time to trade on private information the hearing would make public.

---

[10] The Court does not foreclose the possibility that acting in an independently criminal manner may be another means, aside from acting with an improper purpose, of satisfying the § 1512(c)(2) corruption element.  *See Sandlin*, 2021 WL 5865006, at *12–14; *Nordean*, 2021 WL 6134595, at *10–12.  But because this means of satisfying the corruption element would not present any vagueness problem, *see Sandlin*, 2021 WL 5865006, at *14; *Nordean*, 2021 WL 6134595, at *12, the Court focuses its analysis on the less clear-cut "improper purpose" means.

In discussing these examples, the Court does not attempt to set forth with precision when an individual has or has not acted with an improper purpose. Rather, the narrow project of resolving Andries's facial vagueness challenge requires the Court only to determine whether the statute specifies *any* comprehensible standard of conduct. *See Bronstein*, 849 F.3d at 1107. A statute is not void for vagueness if its only flaw is that it "requires a person to conform his conduct to an imprecise but comprehensible normative standard, whose satisfaction may vary depending upon whom you ask." *Id.* (cleaned up); *see also Johnson*, 576 U.S. at 604–05 ("As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard . . . to real-world conduct; the law is full of instances where a man's fate depends on his estimating rightly some matter of degree." (cleaned up)). The requirement that a § 1512(c)(2) defendant act with an improper purpose, that is, an inherently malign one that at least approximates "the level of culpability we usually require in order to impose criminal liability," *Arthur Andersen*, 544 U.S. at 706 (cleaned up), is such a comprehensible normative standard. *Cf. Caldwell*, 2021 WL 6062718, at 11 (holding that "corruptly" in § 1512(c) requires at least "consciousness of wrongdoing" and that this interpretation saved the statute from constitutional vagueness). It does not require a "wholly subjective judgement[]" about what the law requires. *Williams*, 553 U.S. at 306. It will not be easy in every case to determine whether conduct meets this standard, but "the mere fact that close cases can be envisioned" does not "render[] a statute vague. . . . . The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *Id.* at 305–06. The existence of a substantial, core set of clear applications for "corruptly" in § 1512(c) means that Andries's facial vagueness claim falls "far short of the 'impermissibly vague in all of its applications'" standard, *Crooks*, 845 F.3d at 417; it is not a term that provides "no standard of

conduct at all," *Bronstein*, 849 F.3d at 1107.  Given that there is a substantial core of conduct to which "corruptly" in § 1512(c) constitutionally applies, the Court will not take the drastic step of holding it facially void for vagueness.  *See Harriss*, 347 U.S. at 618.  "[T]here may be scenarios at the edges that present vagueness problems," *Sandlin*, 2021 WL 5865006 at *10, but those must be addressed in the context of as-applied challenges.

Finally, Andries lists several other January 6 Capitol breach defendants who have also faced § 1512(c)(2) charges, and argues that "the facts and circumstances of each case vary drastically from each other and make it clear that the government's charging decisions are inconsistent."  Def.'s Mot. Dismiss at 14.  But "Supreme Court precedent teaches that the presence of enforcement discretion alone does not render a statutory scheme unconstitutionally vague."  *Kincaid v. Gov't of D.C.*, 854 F.3d 721, 729 (D.C. Cir. 2017) (Kavanaugh, J.) (citing *United States v. Batchelder*, 442 U.S. 114 (1979)).  Set against the considerations the Court has outlined, any variance in government charging decisions cannot save Andries's facial vagueness challenge.  The Court denies Andries's motion to dismiss Count I.[11]

---

[11] In his reply brief, Andries for the first time invokes the First Amendment to explain that he "could not possibly have been on notice that he was 'obstructing' an 'official proceeding'" because all he did, he says in his brief, was make certain statements and engage in protest, which is non-criminal protected expression.  Reply at 4–6.  This argument falls under the heading "Even if the Court determines that the Electoral Count is an 'Official Proceeding,' 18 U.S.C. § 1512(c)(2) is Unconstitutionally Vague," *id.* at 4, and it relies on assertions regarding Andries's conduct, so the Court understands the references to the First Amendment as support for Andries's Fifth Amendment as-applied vagueness claim, rather than as a distinct First Amendment overbreadth or as-applied First Amendment claim.  The Court has denied the as-applied vagueness claim as premature, so has no occasion to address any of these First Amendment arguments.  Other judges in this district have faced, and rejected, both overbreadth and as-applied First Amendment challenges to § 1512(c)(2) brought in connection with the Capitol breach.  *See Montgomery*, 2021 WL 6134591, at *23–24; *Mostofsky*, 2021 WL 6049891, at *12; *Caldwell*, 2021 WL 6062718, at *22; *Nordean*, 2021 WL 6134595, at *14.

### B.  Count II, for Violation of 18 U.S.C. § 1752(a)(1), and Count III, for Violation of 18 U.S.C. § 1752(a)(2), State Offenses

Counts II and III charge Andries with violating two subparts of 18 U.S.C. § 1752, which reads:

(a) Whoever--

> (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

> (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

 . . .

[shall be punished as provided in the statute.]

(c) In this section--

> (1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area--

>> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;

>> (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

>> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

> (2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

18 U.S.C. § 1752.  Section 1752(c)(2)'s reference to 18 U.S.C. § 3056 makes clear that the Vice President is an "other person protected by the secret service" for purposes of § 1752(c)(1)(B).[12]

---

[12] So is the Vice President-elect, 18 U.S.C. § 3056(a)(1), and the Superseding Indictment states that then-Vice President-elect Harris was also at the Capitol when Andries entered. Superseding Indictment at 2.  However, in a supplemental brief, the government acknowledges that Vice President-elect Harris was not at the Capitol during the breach, though she was there before and after.  The government therefore claims that Vice President-elect Harris was a person who "will be temporarily visiting" the Capitol, § 1752(c)(1)(B), at the time of Andries's entry. Gov't Opp'n Def.'s Suppl. Mot. Dismiss Counts Two and Three of the Superseding Indictment

18 U.S.C. § 3056(a)(1).  Count II charges Andries with knowingly entering and remaining in the Capitol and its grounds while it was a restricted area, in violation of § 1752(a)(1), and Count III charges him with engaging in disorderly and disruptive conduct in and within proximity to the Capitol with intent to disrupt government functions in violation of § 1752(a)(2).  Superseding Indictment at 2.  Both counts rely on the definition of restricted area found in § 1752(c)(1)(B), a "posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."

Andries argues that both of these counts fail to state an offense for the same two reasons. First, he says that the statute requires the Secret Service, rather than the Capitol Police, to restrict the relevant building or grounds, so the Capitol was not a restricted building or grounds within the meaning of the statute on January 6, 2021.  Def.'s Mot. Dismiss at 14.  Next, he argues that Vice President Pence was not "temporarily visiting" the Capitol on January 6 within the meaning of § 1752(c)(1)(B).  Def.'s Suppl. Br. Supp. Mot. Dismiss Counts I, II, and III of the Superseding Indictment (Def.'s First Suppl. Br.) at 2–4, ECF No. 30.[13]  Both assertions are incorrect as a matter of law, so the Court denies Andries's motion to dismiss Counts II and III.

_____

at 2 n.2 ("Opp'n Suppl. Mot. Dismiss"), ECF No. 31.  But the Superseding Indictment charges that Vice President-elect Harris *was* visiting the Capitol at the time of Andries's entry, not that she would be.  Superseding Indictment at 2.  Similarly, the government's brief also alleges that two of Vice President Pence's immediate family members, also Secret Service protectees, 18 U.S.C. § 3056(a)(2), were at the Capitol, but the Superseding Indictment makes no mention of them.  Opp'n Suppl. Mot. Dismiss.  Once again, the Court must rest its evaluation of Andries's motion to dismiss on the four corners of the Superseding Indictment.  Because, as the Court will explain, the allegation that Vice President Pence was present is sufficient to state the offenses charged in Counts II and III, the Court does not consider the government's claims regarding Vice President-elect Harris's future presence or the presence of Vice President Pence's family members in its analysis of Andries's motion to dismiss.

[13] At oral argument, the Court gave Andries permission to file a supplemental brief raising this new argument.

1.  18 U.S.C. § 1752 Does Not Require the Secret Service to Restrict the Protected Area

Andries says that for an area to qualify as a "restricted building or grounds," § 1752(a)(1), (2), the Secret Service must be the entity that restricts it or cordons it off.  Because the Superseding Indictment does not allege that the Secret Service restricted the Capitol on January 6—the government acknowledges that the U.S. Capitol Police restricted and cordoned off the Capitol that day, Opp'n at 2–3—Andries claims that Counts II and III each fail to state an offense.  Def.'s Mot. Dismiss at 14–17.  Once again, the statute defines "restricted buildings or grounds" in this way:

> (c) In this section--
>
>> (1) the term "restricted buildings or grounds" means *any posted, cordoned off, or otherwise restricted area*--
>>
>>> (A) of the White House or its grounds, or the Vice President's official residence or its grounds;
>>>
>>> (B) *of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting*; or
>>>
>>> (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance . . . .

18 U.S.C. § 1752(c) (emphases added).

Absent from the text is any mention of a requirement that any specific entity must restrict or cordon off the area, let alone a requirement that only the Secret Service may be the restricting entity.  *Mostofsky*, 2021 WL 6049891, at *13 ("The text plainly does not require that the Secret Service be the entity to restrict or cordon off a particular area."); *United States v. Griffin*, 549 F. Supp. 3d 49, 56 (D.D.C. 2021); *McHugh*, 2022 WL 296304, at *19; *United States v. Caldwell*, No. 21-cr-28, Dkt. No. 415, slip op. at 4 (D.D.C. Sept. 14, 2021).  The Superseding Indictment charges that Vice President Pence, a Secret Service protectee, was at the Capitol and that Andries entered an area within the Capitol and its grounds that was "posted, cordoned off, or otherwise

restricted," so it sufficiently states the restricted area element of the § 1752 offenses charged in Counts II and III.  Superseding Indictment at 2.

Andries's argument to the contrary relies heavily on legislative history and policy considerations.  But such factors do not permit the Court to add a requirement to unambiguous statutory text.  When "the words of a statute are unambiguous, the judicial inquiry is complete." *Griffin*, 549 F. Supp. 3d at 56 (quoting *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020)).  In any event, Andries's extra-textual considerations at best do not support his reading and at worst undermine it.  He points out that when Congress passed § 1752 in 1970, it was concerned that "[a]lthough the Secret Service is charged with protecting the person of the President (among others) there is, at the present time, no Federal statute which specifically authorizes them to restrict entry to areas where the President maintains temporary residences or offices."  S. Rep. No. 91-1252 at 7 (1970); *see* Reply 8–9.  The Senate Judiciary Committee explained that it was concerned with instances in which the Secret Service had to rely on a patchwork of state and local laws and inconsistent assistance from local authorities.  *Id.*  But that Congress may have envisioned the Secret Service as the *primary* restrictor of areas visited by the President and other protected officials, and that it may have primarily been concerned with presidential travel in areas within the control of state authorities, does not mean that it meant to make the Secret Service the *exclusive* restrictor.  The statements in the Senate Judiciary Committee report are consistent with Congress's apparent choice to leave the statutory text open-ended so that other competent entities, such as the U.S. Capitol Police or state officials when they *were* capable of doing so, could restrict areas around protected officials.

Andries has something of an answer to the legislative history's failure to expressly limit restriction authority to the Secret Service; he notes that the Secret Service was formerly a

component of the Treasury Department and the original version of the statute authorized the Secretary of the Treasury to "designate by regulations the buildings and grounds which constitute the" protected residences of the President and other Secret Service protectees—one category of locations subject to the statute's coverage.  18 U.S.C. § 1752 (a)(1), (d)(1) (1970).  It also gave the Treasury Secretary authority related to a second category of locations, the one analogous to the current statute's "posted, cordoned off, or otherwise restricted area  . . . where the President or other person protected by the Secret Service is or will be temporarily visiting" definition at issue in this case, 18 U.S.C. § 1752 (c)(1)(B) (2018).  The 1970 version covered "any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting."  18 U.S.C. § 1752 (a)(1)(ii) (1970).  It authorized the Secretary of the Treasury "to prescribe regulations governing ingress or egress to such locations."  *Id.* § 1752 (d)(2).  Notably, even in this version of the statute, Congress did not say that only the Treasury Secretary could restrict the areas a protected official was temporarily visiting.  Like the current version, the 1970 version said nothing about "who must do the restricting."  *Griffin*, 549 F. Supp. 3d at 55.  Congress knew how to provide the Treasury with authority related to restricted areas—it gave Treasury the narrow authority to regulate the "ingress and egress" to such areas—but it chose not to locate the authority to restrict in the first place with the Treasury.

Even if these references to the Treasury somehow suggested that Congress in 1970 meant to specify the Secret Service as the only entity that may restrict areas, they do not further Andries's claim about the statute as it exists today.  Congress removed all references to the Treasury in 2006 and did not replace them with any references to regulations of the Department of Homeland Security, the Secret Service's new home.  *See McHugh*, 2022 WL 296304, at *20

36

(citing USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, § 602, 120 Stat. 192, 252 (2006)).  To be sure, current law does assign the Secret Service some role in determining § 1752's coverage—but in a limited way, and with regard to a definition of restricted area not relevant here.  In addition to the definition of "restricted buildings or grounds" at issue here (where the President and other protectees are temporarily visiting), "restricted buildings or grounds" also include areas restricted "in conjunction with an event designated as a special event of national significance."  18 U.S.C. § 1752(c)(1)(C).  "When directed by the President, the United States Secret Service is authorized to participate, under the direction of the Secretary of Homeland Security, in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President."  18 U.S.C. § 3056(e)(1).  That the Secret Service is *one* authorized participant in security operations for special events of national significance does not establish that it is the only entity authorized to help with such operations, much less that it is the only entity that may "restrict[]" "a building or grounds" "in conjunction with" such an event.  18 U.S.C. § 1752(c)(1)(C).  Even if it did, this would tell us nothing about the separate definition of "restricted buildings or grounds" at issue here, § 1752(c)(1)(B)'s provision for buildings or grounds where the President or other protected person is temporarily visiting.  *See McHugh*, 2022 WL 296304, at *19.

As it stands today, the statute defines restricted areas (as relevant here) in terms of their physical characteristics  ("posted, cordoned off, or otherwise restricted") and in terms of who is present within the area (Secret Service protectees).  18 U.S.C. § 1752(c)(1)(B).  It does not say who must restrict the area, by, for example, cordoning it off or setting up signs prohibiting entry.  Contrary to Andries's suggestion, *see* Def.'s Mot. Dismiss at 17, this open-ended structure makes policy sense.  It extends the law's protection of Secret Service protectees to areas where

sufficient physical restrictions may already exist, such as military facilities, or where partner federal or local authorities are willing to assist with setting restrictions (such as the Capitol Police on January 6), without requiring the Secret Service to set up unnecessary additional physical restrictions.  *See Griffin*, 549 F. Supp. 3d at 54 (noting that the U.S. Park Police "share responsibility for the parklands surrounding the White House").

Andries protests that "if there is no designation as to 'who must' restrict the area, it could create another absurd result . . . that anyone claiming to be a part of law enforcement could post a sign designating an area as restricted and a criminal defendant could then be penalized for trespassing because they 'willfully' ignored the sign."  Def.'s Mot. Dismiss at 17.  Assuming without deciding that Andries's hypothetical about a private restrictor correctly states the law, the statute's other elements, including that one of the few protectees of the Secret Service be in the area and that the defendant act "knowingly" and "without lawful authority," *see, e.g.*, 18 U.S.C. § 1752(1), considerably limit the scope of potential liability in such a situation. Moreover, the Court is not convinced that it would be absurd in all cases to allow a private individual to set up the restricting barriers; imagine, for example, a presidential visit to a private home surrounded by fences and "do not enter" signs.  *Griffin*, 549 F. Supp. 3d at 57 (highlighting such a possibility).  Does the Secret Service need to duplicate these barriers in order to trigger the statute's protections?  In any event, any hypothetical unreasonable applications at the edges of the statute's coverage would not license the Court to write into the statute a requirement that Congress omitted.  *Cf. United States v. Long*, 997 F.3d 342, 356 (D.C. Cir. 2021) ("[C]ourts may not use the absurdity canon to set aside plain text unless the absurdity and injustice of applying the provision to the case would be so monstrous that all mankind would, without hesitation, unite in rejecting the application." (cleaned up)); *see McHugh*, 2022 WL 296304, at *20 (addressing a

similar argument and holding that "there is nothing absurd about criminalizing the breach of any barrier around a Secret Service protectee, and [that] the Court will not create its own atextual absurdity based on a fringe hypothetical that does not even remotely resemble the facts before the Court").

2.  Vice President Pence Was Temporarily Visiting the Capitol on January 6, 2021

Andries's final argument is that Vice President Pence was not "temporarily visiting" the Capitol on January 6, 2021.  18 U.S.C. § 1752(c)(1)(B) (defining "restricted buildings or grounds" in part to include a restricted area "of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting.").  Judge Bates recently issued a thorough opinion rejecting the same argument, and the Court agrees with his conclusion.  *McHugh*, 2022 WL 296304 at *2.

Andries cites dictionary definitions of "temporary" and "visit" to assert that "the phrase 'temporarily visiting' connotes temporary travel to a location where the person is not normally living and/or working on a regular basis."  Def.'s First Suppl. Brief at 2.  Fair enough, as a general matter.  Temporarily means "for a time (only); during a limited time."  *McHugh*, 2022 WL 296304, at *20 (quoting *Temporarily*, Oxford English Dictionary (2d ed. 1989) and collecting similar dictionary definitions).  To "visit" means "to go to see or sojourn at (a place) for a particular purpose (as for business, pleasure, or sight-seeing)."  *Visit*, Merriam-Webster Unabridged Dictionary, https://unabridged.merriam webster.com/unabridged/visit (last visited Feb. 24, 2022); *see McHugh*, 2022 WL 296304,, at *20 (collecting similar dictionary definitions).  Thus, Vice President Pence was "temporarily visiting" the Capitol on January 6, 2021 if he went to the Capitol for a particular purpose, including a business purpose, and for a limited time only.  *See McHugh*, 2022 WL 296304, at *20.  Plainly he did.  He went to the Capitol for the business purpose of carrying out his constitutionally assigned role in the electoral

count proceeding; he intended to and did stay there only for a limited time.  *Id.* at 21 (noting that Vice President Pence left the Capitol in the early morning hours of January 7, when Congress finished certifying the count after delays caused by the breach).

Andries protests that Vice President Pence was "working and meeting" at the Capitol on January 6 rather than "visiting it," Def.'s First Suppl. Br. at 3, but as the definitions just discussed make clear, one can "visit" a location for the business purpose of working and meeting there.  Andries also notes that Vice President Pence resided in Washington, D.C. and, as President of the Senate, held a permanent office at the Capitol.  Thus, he argues "that a person generally cannot be said to be 'temporarily visiting' his own office building located approximately four miles from his home."  Def.'s Reply Supp. Suppl. Mot. Dismiss at 2, ECF No. 34; *see* Def's First Suppl. Br. at 3.  Andries's proposed geographic limitation does not hold up; "obviously one can 'temporarily visit' the house next door, a neighborhood church, or a restaurant across town."[14]  *McHugh*, 2022 WL 296304, at *21.  And though there is some intuitive appeal to Andries's suggestion that a person does not "visit" a place where he maintains an office, dictionary definitions of the term do not impose such a limitation.  *See id.* at *22. Moreover, there are situations in which it would be quite natural to say that a person "temporarily visits" a place where she has an office: consider a CEO of an international corporation who normally works from headquarters in New York, but who maintains an office for her occasional use at the firm's satellite location in London.  When the CEO travels to check

---

[14] In passing, Andries invokes federalism principles to suggest that the Court should not interpret the statute to duplicate the coverage of state criminal laws, which might suffice to protect the President while visiting a home-state residence outside of the District of Columbia. Def.'s Reply Supp. Suppl. Mot. Dismiss at 5.  All of the charged conduct in this case took place in the District of Columbia, so any federalism concerns are irrelevant to the Court's interpretation.  *Caldwell*, No. 21-cr-28, Dkt. No. 415, slip op. at 4 (D.D.C. Sept. 14, 2021).

in on her colleagues in London, she temporarily visits the London office, even if she works at her reserve office while there.  *See Visit*, Merriam-Webster Unabridged Dictionary, https://unabridged.merriam webster.com/unabridged/visit (last visited Feb. 24, 2022) (one definition of "visit" is "to come or go officially to oversee or correct the operation of").

Indeed, the legislative history—which Andries invokes for its references to the need to protect the President when he is outside D.C., *see* Def.'s Reply Supp. Suppl. Mot. Dismiss at 2–3—suggests that Congress foresaw a similar situation involving the high-level officials § 1752 protects, many of whom might maintain offices in multiple locations.  The Senate Judiciary Committee explained that § 1752 was designed to remedy the fact that "there is, at the present time, no Federal statute which specifically authorizes [the Secret Service] to restrict entry to areas where the President maintains temporary residences *or offices*."  S. Rep. No. 91-1252 at 7 (1970) (emphasis added).  Like a President who maintains an office at his home-state residence, and like the CEO who maintains a reserve office at her firm's satellite location, Vice President Pence held an office at the Capitol, but did not use that office as his primary, regular workspace.  *See McHugh*, 2022 WL 296304 at *22 ("Although the [Vice President's senate office] was 'the only space in the city assigned to the vice president' in the 19th century, the Vice President has had other spaces from which to do his or her job since 1909.  At present, the Vice President's working office is in the West Wing of the White House, and she also maintains a ceremonial office in the Eisenhower Executive Office Building." (citations omitted)).  Accordingly, even if it is "awkward . . . to describe an ordinary commute from home to one's regular workplace as 'temporarily visiting' the office," *McHugh*, 2022 WL 296304, at *22, this case does not present such a situation.  Vice President Pence was "temporarily visiting" the Capitol on January 6 within the meaning of § 1752.  Counts II and III state offenses.

**V.  CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss Counts I, II, and III of the

Superseding Indictment (ECF No. 20) is **DENIED**.  An order consistent with this Memorandum

Opinion is separately and contemporaneously issued.

Dated:  03/14/2022                                         RUDOLPH CONTRERAS
                                                    United States District Judge