UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JOHN D. ANDRIES,<br><br>    Defendant. | Case No. 21-cr-93-RC |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence John D. Andries to a midpoint sentence of 24 months' incarceration, three years of supervised release, $2,000 in restitution and the mandatory $100 special assessment.

### I.    INTRODUCTION

John Andries participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars' in losses.[1]

Andries's conduct targeted the police and Members of Congress – and like the conduct of every rioter that day, threatened democracy itself. Andries entered the Capitol by climbing through

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $ 2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

a broken window adjacent to the Senate Wing Door just one minute after the initial breach of the Capitol at that location, making him part of the initial wave of rioters to breach the building. He recorded himself yelling throughout the Capitol and once outside, had to be forcibly moved away from the building by police. Then, twice during the pendency of the instant case, Andries was arrested on new criminal charges in Maryland for assaultive behavior.

The government recommends that the Court sentence Andries to 24 months' incarceration, which is within the advisory Guidelines' range of 21 to 27 months, as calculated by the government. A 24-month sentence reflects the gravity of Andries's conduct, which, while not resulting in lasting physical injury or property damage, nonetheless threatened to cause both – to say nothing of the psychological scars of the many victims of the riot and damage to the institution of democracy.

## II.     FACTUAL BACKGROUND

### A.     Andries's Role in the January 6, 2021 Attack on the Capitol

As set out more fully in the statement of offense (*See* ECF No. 61), Andries participated in the attack on the United States Capitol, an attack that disrupted the peaceful transfer of power after the November 3, 2020 presidential election and caused extensive damage and injury.

Andries travelled from his home in Maryland to Washington, D.C. to attend the rally at the Ellipse for then-President Trump. He joined the throng marching to the Capitol, arrived at the West Front of the Capitol and passed into the restricted area. Assaults against police on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.

Andries contributed to the rioters' aggression on the West Front by, in part, tossing aside

a tent that was assembled over equipment for the inauguration:



Andries accessed the Upper West Terrace by climbing stairs under the scaffolding on the inauguration stage on the West Front while a rioter near him wiped tear gas from his eyes:



Andries breached the Capitol building at approximately 2:14 p.m. by climbing through a broken window adjacent to the Senate Wing Door which rioters had broken open less than one

3

minute earlier, as alarms blared:



He turned right and walked down a hallway to the Capitol Crypt. Andries was one of the first rioters into the Crypt. There, U.S. Capitol Police formed a line of officers blocking the rioters from advancing further into the building. Andries walked up to and gesticulated towards the USCP officers several times, getting within inches of them on occasion. Meanwhile, other rioters continued streaming into the Crypt, waved in by Andries, quickly outnumbering the officers and pushing past them:





Once the police line in the Crypt broke, rioters had unfettered access to the Capitol building. Andries walked through Statutory Hall to the Statuary Hall Connector. In the Statuary

5

Hall Connector, Andries joined yet another group of rioters outside the House Chamber as they attempted to gain access to the House Chamber where members of Congress were sheltering. Here, Andries filmed himself stating, *inter alia:*

- "We're in the U.S. Capitol.  They tear gassed us, trying to scare us away."
- "Hey y'all think they hear us now?"
- "Stop the steal."
- "Knock-knock motherfuckers."
- "Think they're scared yet?"
- "I think the police have gotten the message, we ain't back'n down."

This, while other rioters chanted, "Break it down" in reference to the House Chamber Door.

At approximately 2:56 p.m. Andries appeared to be leaving the Capitol through the Upper House Door when he saw another rioter in a scuffle with a police officer. Andries turned back, rushed to the scuffle and pushed the officer. The officer appeared to raise a baton as Andries exited the camera frame. About a minute later, police pushed Andries and other rioters out of the building.

Once outside the building, but still within the restricted grounds, Andries filmed another video in which he stated, "We made it to the speaker's chambers . . . I think we're on the right side of history." He also stated, "Sounds like they're on the way out. I don't know if it was me or somebody else, but I know I tried to pull the fire alarm. I wasn't sure if I was successful, but I know somebody did it this time for sure. I hear it (audible beeping in the background)."

At approximately 4:25 p.m., Metropolitan Police Officers (MPD) attempted to move the crowd away from the Capitol building. An MPD officer's body-worn camera captured Andries's resistance and interference to the police. Specifically, Andries first pushed against the officers who tried to get the crowd to move and then sat down on a ledge and refused to move. Officers

were forced to physically drag him away.

### III.     INDICTMENT AND PLEA AGREEMENTS

On May 26, 2021, the grand jury returned a superseding indictment charging Andries with Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) and (2), and four misdemeanors, including Entering and Remaining in a Restricted Building or Grounds, Disorderly and Disruptive Conduct in a Restricted Building or Grounds, Disorderly Conduct in a Capitol Building and Parading, Demonstrating or Picketing in a Capitol Building. ECF No. 15. On August 23, 2022, Andries pled guilty to Count One, Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), pursuant to a plea agreement. August 23, 2022 Minute Entry.

### IV.     STATUTORY PENALTIES

As noted by the plea agreement and the U.S. Probation Office, Andries faces up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count One, Obstruction of an Official Proceeding.

### V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

In the plea agreement, the parties stipulated to the following Guidelines analysis:

Count Two: 18 U.S.C. § 1512(c)(2)

| | | |
|---|---|---:|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[2] | +3 |
| | **Total** | **17** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **14** |

*See* Plea Agreement at ¶¶ 5(A).

The Probation Office, however, recommends a total offense level of 17, concluding that Andries is not entitled to a three-level downward adjustment for acceptance of responsibility owing to his post-plea agreement arrest and assault charge. PSR ¶ 34. As Probation explains:

> Specifically, the defendant entered into the plea agreement in this matter on August 23, 2022. However, on October 17, 2022, he was arrested for second degree assault and charged in Saint Mary's County, Maryland, District Court docket no. D-043-CR-22-1682. Pursuant to USSG §3E1.1, comment. (n.1), Acceptance of Responsibility may be denied if the defendant fails to voluntarily terminate or withdraw from criminal conduct. Accordingly, the reduction for Acceptance of Responsibility was not applied.

PSR ¶ 34. Several Courts of Appeals have affirmed the denial of a downward adjustment for acceptance of responsibility based on Application Note 1 to Section 3E1.1. *E.g., United States v.*

---

[2] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Andries admitted that he corruptly obstructed and impeded an official proceeding, namely the certification of the Electoral College vote count. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement officials from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

*Thomas*, 74 F.3d 701, 716 (6th Cir. 1996); *United States v. Franks*, 46 F.3d 402, 406 (5th Cir. 1995); *United States v. Hausler*, 409 F. App'x 4, 8 (7th Cir. 2010) (unpublished). Based on that determination, Probation recommends a total offense level of 17. PSR ¶ 44.  After review of the facts in the instant matter, the government will continue to recommend a three-level downward adjustment to the offense level for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) and (b), resulting in a total offense level of 14.  However, the defendant's arrest on October 17, 2022 is properly considered by the Court as relevant to sentencing under 18 U.S.C. § 3553(a).

The Probation Office calculated Andries' criminal history as category III, which the government does not dispute. PSR ¶ 52.  Accordingly, Probation concluded that the Guidelines imprisonment range is 30 to 37 months. PSR ¶ 96. The government concludes that the appropriate Guidelines imprisonment range in this case is 21 to 27 months, and notes that the plea agreement expressly permits the government to advocate for that Guidelines range. ECF No. 60, ¶¶ 5A and 5B.

**VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)**

Under 18 U.S.C. § 3553(a), the factors this Court must consider when imposing a sentence include the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, the Section 3553(a) factors weigh in favor of a term of incarceration.

### A.     Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Andries's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

Andries's role in the January 6 attack merits a significant term of incarceration. He was in the initial wave of rioters to breach the building, one of the first to square off against police in the Crypt, encouraged others into the Crypt causing the critical mass to form that was necessary to break the police line allowing rioters to stream throughout the Capitol. He joined rioters outside the House Chamber Door as they attempted to get access to the Chamber wherein members of Congress were sheltering. Andries physically involved himself in a scuffle between police and a rioter even though he was feet from exiting the building. This conduct is all in relation to the act of breaching the Capitol and his conduct inside the building. Outside the building, he tossed aside a tent, refused to leave the Capitol grounds and had to be physically dragged away by police, all while offering his own soundtrack to add gloss to his intent, including: "Knock-knock motherfuckers."; "Think they're scared yet?" and "I think the police have gotten the message, we ain't back'n down."

Andries's pride in what he did on January 6 is reflected in his words and memorialized in his videos. None better than his words on the portico after being pushed out of the building by police, "We made it to the speaker's chambers . . . I think we're on the right side of history." Participating in the worst attack on the Capitol since the War of 1812 does not leave one on the right side of history. Andries's activities at the Capitol, which included property damage and conduct that threatened to cause injury, his desire to broadcast his behavior and celebrate the same, and his pride in his actions, all demonstrate the need for incarceration.

### B. Andries' History and Characteristics

As set forth in the PSR, Andries is a former United States Marine, achieving the rank of corporal (E4), though he was demoted prior to his honorable discharge. ECF No. 68, ¶ 80.

Andries is in Criminal History Category III. He has previous criminal convictions including one in 2010 for driving while intoxicated, for which he received one year probation, and another in 2020 for driving under the influence of alcohol, for which he received 30 days jail and two years unsupervised probation.

On February 25, 2022, Andries violated his conditions of release in this case when he was arrested for, *inter alia*, felony assault on a police officer. According to the police report, at approximately 11:37 pm on February 25, 2022, at Action Lounge & Billiards in Leonardtown, Maryland, Andries became intoxicated and reportedly pulled a female's hair and made "patrons uncomfortable." *See* Exhibit A: police reports, February 25, 2022. Andries was asked to leave the establishment. *Id*. Andries became belligerent and made threats to staff who removed him from the premises. *Id*. Andries attempted to reenter the bar and was being held back by staff when police, who happened to be at the establishment for another incident, offered assistance to the staff in dealing with Andries. *Id*.

Police attempted to calm Andries and explain that if the staff wanted him removed, he needed to leave. *Id.* Andries refused to comply with the police directives and attempted to reenter the bar. *Id*. Police informed Andries to either go home or be arrested. Id. Andries stated, "nope" and then pushed one of the officers in the chest, whereupon he was placed in handcuffs. *Id.* Andries refused to cooperate with police, sat down while handcuffed, and had to be dragged and carried to a police vehicle. *Id.* Once at the police vehicle, Andries refused to sit properly and laid so that his upper body was in the vehicle seat, but his lower body remained outside the vehicle. *Id.* Additional officers had to be summoned assist in bringing Andries under control. *Id.*

An officer told Andries that if he did not comply and sit in the vehicle, he would be tased.

12

*Id*. Andries refused to sit in the vehicle, whereupon the officer tased his leg. *Id.* Undeterred, Andries still refused to sit in the vehicle and was tased a second time, but still did not enter the police vehicle. *Id.*

Officers determined they needed to call the jail's transport van to bring Andries to jail. *Id*. While waiting for the van to arrive, Andries repeatedly kicked an officer and had to be restrained until the transport van arrived. *Id*. He then refused to enter the van and had to be carried and placed inside by police. *Id.*

A search incident to lawful arrest found Andries was carrying a knife. *Id.*

According to court records, Andries was charged with felony assault in the second degree, misdemeanor disorderly conduct and misdemeanor resisting/interfering with arrest.  In May 2022, Andries pled guilty to resisting arrest and was sentenced to 180 days jail, all suspended but 10 days, and two years unsupervised probation.

On October 17, 2022, Andries was again arrested in Maryland on a charge of assault in the second degree for punching the complainant in the face.  In that case, Andries's ex-girlfriend's new boyfriend claims Andries punched him in the face during a custody exchange of Andries's child.  *See* Exhibit B: court documents, October 17, 2022.  The charges remain pending, and a trial is scheduled for January 2023.

While he has now accepted responsibility by pleading guilty, Andries's earlier recorded statements about the riot were the opposite: devoid of remorse and filled with pride.  He claimed he was "on the right side of history" for what he did on January 6 and made light of his tromping through the Capitol by asking, "Do you think they hear us yet?"  The objective appeared to be to depict the Capitol attack as victimless and justified.  Neither is true.

13

Considering criminal history and his post-arrest conduct, the government requests a period of incarceration.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Andries's criminal conduct, which includes corruptly obstructing an official proceeding, destroying property and celebrating the breach by declaring himself "on the right side of history" represents disrespect for the law. When Andries entered the Capitol grounds and the Capitol itself, it was abundantly clear to him that lawmakers and their staffs, and the police officers who tried to protect them, were under siege. He mused on recordings, "Hey y'all think they hear us now?" "Knock-knock motherfuckers." And "Think they're scared yet?"

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

14

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

There is also a need for specific deterrence here. Notwithstanding his guilty plea, Andries has not expressed any remorse or contrition. Without some indication that Andries has renounced, learned from, or even regrets his conduct on January 6, there is a greater possibility that he will do something similar again. The Court viewed body-worn camera from Andries's arrest on February 25, 2022 for assaulting police. The same disrespect Andries showed officers at the Capitol on January 6, 2021 was on display again at a Maryland bar on February 25, 2022. The same passive resistance to police he employed at the Capitol that resulted in him being physically dragged from the building was employed again on February 25, 2022, as police had to carry him to the police transport van. He followed that up with another arrest for assault in the second degree, which remains pending. It is evident that his arrest and prosecution for January 6 has not deterred

---

[4] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

Andries's criminal conduct. Perhaps a sentence of incarceration will.

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United*

16

*States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). The goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

---

[5] The Guidelines ranges in Capitol siege cases may be more likely to understate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's]

17

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court could compare this case with another January 6 case over which it presided. In *United States v. Ricky C. Wilden,* No. 21-cr-423 (RC), Like Andries, Wilden's total offense level was 17, although he was convicted of violating 18 U.S.C. § 111(a)(1), not Section 1512(c)(2). Because Wilden's CHC I, his Guidelines Range was only 24 to 30 months. Wildens' aggressive conduct towards the police was similar to Andries'. Wilden sprayed at least six U.S. Capitol Police Officers with a chemical irritant. Celebrating his shameful and assaultive conduct, Wilden later posted to Facebook, "I think they got the message from everyone of all ages" and "FYI the cop who started this shit by macing me and hitting my nuts playing stupid games, hope you enjoyed my special prizes."

Unlike Andries, Wilden suffered from substantial hardships. He grew up in a violent, drug-addicted household. His father kicked him out of the house when he was a teenager, resulting in a period of homelessness. He was introduced to drugs at a very young age and overdosed as recently as 2019. His brother was killed in a car accident, and his father committed suicide in 2020. Wilden's son suffers from autism. Wilden himself suffer from depression. This Court imposed a custodial sentence of 24 months' imprisonment, the bottom of the Guidelines range.

Andries's conduct is arguably more aggravated than that of Christin Priola, who Judge Chutkan recently sentenced to 15 months' incarceration. *United States v. Christin Priola,* No. 22-cr-242-1 (TSC). Priola entered the Capitol through the East Rotunda Doors and made her way to the Senate Chamber floor. Through she entered the Senate Chamber, Priola had no prior criminal

---

conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

history and did not engage in violent or destructive behavior. In contrast, Andries is in criminal history category III, threw aside a tent and had to be physically dragged from the Capitol. Judge Chutkan also credited Priola's sincere contrition, nothing of which has been exhibited by Andries.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[6] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Here, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Andries must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Andries played in the riot on January 6.[7] Plea Agreement ¶ 12. The plea agreement reflected an earlier estimate of

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

19

damages caused by the riot at the United States Capitol (approximately $2,734,783.14), a figure based on loss estimates supplied by the Architect of the Capitol as of August 2022. *Id.* As of October 14, 2022, the government's estimate had arisen to $2,881,360.20. As the government noted at the change-of-plea hearing, though, it has not required defendants to agree to pay greater restitution following the upward revision of the damages figure, but it anticipates doing so in the near future.

Andries's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 124.

## VIII. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 24 months, which is within the Guidelines range as calculated by the government and as agreed upon by the parties in the plea agreement, three years of supervised release, restitution of $2,000 and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   */s/ Douglas G. Collyer*
DOUGLAS G. COLLYER
NDNY Bar No. 519096
Assistant United States Attorney
U.S. Attorney's Office
14 Durkee Street, Suite 340
Plattsburgh, New York 12901
Office: 518-314-7800
Douglas.Collyer@usdoj.gov