### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No.   21-cr-093 (RC)** |
| **John Andries** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

People are all very quick to suggest that the only real punishment is a jail sentence, and it's just not true. People can suffer in many different ways and do suffer in many different ways a result of their conduct and that is something every judge, at least on this court, I believe, understands, and takes into account when they're fashioning the appropriate sentence.

Quote from the Honorable Amit P. Mehta, *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 29.

Mr. Andries is a 37-year-old ████ Veteran who has already suffered immensely as a result of his conduct. In the past two years, Mr. Andries has experienced countless collateral consequences as a result of his pending case. One of those consequences is how it has negatively impacted his pending child custody civil case. The instant matter has added fuel to the fire of an already tumultuous relationship between him and his ex-wife. Mr. Andries loves his son more than anything and the instant matter has decreased his ability to legally be with him. This alone is more of a punishment than any jail time and more of a deterrence than any period of incarceration could ever achieve.

1

Despite Mr. Andries's disrespectful and brazen conduct on January 6, 2021, the fact remains that he was not violent, never destroyed property, and did not bring weapons or act in concert with extremist groups. He also did not pre-plan his actions or enter into any sensitive areas. He acknowledges now that his intentions on being "civilly disobedient" were misguided. Mr. Andries did not want violence to occur, and in fact encouraged others not to be violent or destructive. Even his ex-wife, who has used this case against him in many ways, told law enforcement during an interview that she did not think Mr. Andries was a violent person. Mr. Andries was cooperative with law enforcement after his arrest and did not obstruct the investigation.

Since January 6, 2021, Mr. Andries has truly distanced himself from the events and has been obtaining counseling and attending many court hearings and mediations because of his ongoing child custody matter. He regrets his actions deeply and sincerely and will never repeat them.

Probation's estimated guideline range is incorrect for the reasons described fully below. However, even if the Court adopts this range, it substantially overstates the nature of his conduct and fails to take into account many unique considerations.

When looking at his specific conduct on January 6, 2021, and the rest of the 3553(a) factors, a lengthy period of incarceration is not warranted. Based on a thorough consideration of each sentencing factor and all of the unique mitigating circumstances, Mr. Andries respectfully requests that the Court impose a sentence of no more than 60 days' incarceration followed by a term of supervised release that

places him on home confinement for the first 12 months. However, if the Court intends on imposing a lengthier period of incarceration, based upon a review of past sentences imposed for similar conduct, Mr. Andries submits that the Court should impose a sentence no greater than 6 months' incarceration.

## BACKGROUND

On August 23, 2022, Mr. Andries entered a guilty plea to one count of Obstruction of an Official Proceeding in violation of 18 USC §1512(c)(2) for his participation in the events on January 6, 2021.  In his plea agreement, the parties agreed that the estimated guideline range would be 15-21 months. This estimation was based on an unawareness by the parties that Mr. Andries was technically still on *inactive* supervision for a misdemeanor matter from 2020. Unfortunately, as a result, his guideline range is 18-24 months. His guideline range, however, is not 30-37 months as the probation office incorrectly calculates.

## ARGUMENT

### I.    Legal Standard

The Court is well aware that the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007), have dramatically altered the law of federal sentencing.  While courts must continue to consider the sentencing guidelines, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes

of sentencing as set forth in 18 U.S.C. §3553(a).[1]  As the Supreme Court made clear

in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be

considered alongside other statutory considerations set forth in 18 U.S.C. §3553(a).

In two more summary reversals, the Court further clarified that the

Guidelines cannot be used as a substitute for a sentencing court's independent

determination of a just sentence based upon consideration of the statutory

sentencing factors.  *Nelson v. United States*, 129 S. Ct. 890 (2009), 2009 WL 160585

(Jan. 26, 2009); *Spears v. United States*, 129 S. Ct. 840 (2009), 2009 WL 129044

(Jan. 21, 2009).  "Our cases do not allow a sentencing court to presume that a

sentence within the applicable Guidelines range is reasonable," the Court held in

*Nelson*.  2009 WL 160585, at *1.  "The Guidelines are not only *not mandatory* on

sentencing courts; they are also not be presumed reasonable." *Id*. At *2.  In other

words, a sentencing court may not rely on the Sentencing Guidelines range as a

default to be imposed unless a basis exists to impose a sentence inside that range.

Rather, the court must weigh each of the factors and impose a sentence that

constitutes the least amount of imprisonment necessary pursuant to Section

3553(a).

## II.    Imposing a Variant Sentence is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).

---

[1] Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. §3553(a).

### a.  Mr. Andries's Personal History and Characteristics

John was born in Houston, Texas in the fall of 1985 to his parents, Jack Andries and Janet Andries. John resided in Houston in his childhood home until he was 19 years old. John's life has been riddled with hardship from his very first moments on this Earth. Janet suffered from complications during John's birth from a previous pregnancy and delivered John in an emergency C-Section. Growing up, John suffered from an array of ear infections. Unfortunately this was only the beginning of his fight to keep and maintain his physical health.

John has two older half-sisters, Johanna and Denita. In John's household, his parents were gone a lot of the time, working, and leaving John in Johanna's care. With the 8 year age difference between Johanna and John, she became his primary caretaker and babysitter. John remembers that she would babysit him so often that those around him thought that Johanna was his mother. At just 10 years old, John was left alone as Johanna embarked to school and he suddenly felt like an only child. John stated that he pretty much felt like a loner and when Johanna left, he lost his sister and her friends, who he felt like he could open up and talk to. John's other half-sister Denita was absent from their family home. Denita struggled with substance abuse and was sent to live with her mother when John was only around 9 years old. John remembers feeling confused and hurt when she had to leave.

At age 19, John left his family home in search of a greater purpose. This led John to enter into the Marine Corps. He entered into the Navy recruiting office and

scored very highly on the ASVAB, which is a placement test that the United States Military uses to see where prospective recruits qualify in different positions. John chose to be a Helicopter Crew Chief and was eager and ready to serve his country. While in boot camp, John sustained a foot injury that led him to delay completing boot camp until he was completely rehabilitated. John was determined to finish what he had started.

During his time as a Helicopter Crew Chief, John learned how to maintain, fly and work on helicopters. He had gone through extensive training including water survival and combat training. John excelled at this position, being given the opportunity to fly helicopters throughout the world; in parts of Africa and Europe. John's most impressive accomplishment was being trusted to fly within the HMX-1 unit, better known as the Presidential Helicopter Squadron. This meant that John was trusted to transport the president, vice president and those in line of succession after the president. This was not entrusted to just anyone trained in this unit. During his time in the unit, he would fly in "Marine Two" which was the helicopter that had transported former Vice President Dick Cheney. John took his position and his duty very seriously, understanding the respect that the president, vice president and those in line of succession deserved. He remained in this unit and was based in Quantico for the rest of his military career.

In 2009, John was honorably discharged and he was ready to take on the world. John attempted to go to back to university but missed his mechanical and technical work. He was able to get a job through a government contract that was

located in the DC area, working on helicopters. When he first started this job he was still living in Fredericksburg, Virginia and the commute was long. After he moved from the night shift to the day shift, the traffic commute became unbearable. After leaving that position, he ended up taking another military contract working for DynCorp International as a civilian tester of military aircraft.

In the spring of 2012, John was in a traumatic car accident. He flipped his 1972 Mustang and was pinned under the vehicle, wandering in and out of consciousness. John said he can only remember seeing the lights from all the emergency vehicles, a helicopter and then waking up at Prince George's County Hospital with his mother by his side. John suffered from lacerations on his back that required approximately 60 staples. John was also told that he had a concussion and was having seizures.

The most defining year for John was 2018. This is when everything began to change for him. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████  ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

█ █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████

███████████████

████████████████████, ███████████████████████████

██████████████████████████████████

████████████████████████████████

██████████████████████████████. His relationship with his son's mother has caused him major stress and anguish as she has made every effort to obtain full custody. As a result, John is only allowed supervised visitation on the weekends. John sees his son any chance he can get and would do anything for more time with him. John enjoys being outside with his son, teaching him things and being the best father he can be to him with the limited time he has with him.

██████████████████████████████████

█████████████████████████████.

████████████████████████████████

████████████████████████████████████

██████████████████████████████████

█████████████████████████████ ███████████

██████████████████████████████████

████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

### b.  Nature and Circumstances of the Offense

Unlike many other January 6 defendants, Mr. Andries lives in Maryland and so did not travel from a far to attend the #Stop the Steal Rally. On January 6, 2021, Mr. Andries left his home to attend the rally, however he arrived when the speeches were coming to an end. He ran into individuals who were yelling "We are going to the Capitol building!" Presumably, those fired up individuals yelling listened to several speeches encouraging the crowd to march to the Capitol to "stand up for this country and stand up for what is right.[3]" The Former President Trump, after several minutes of reiterating his claims that the election was stolen, said the following to the crowd on January 6, 2021:

> We will not let them silence your voices. We're not going to let it happen, I'm not going to let it happen…..We're gathered together in the heart of our nation's capital for one very, very basic and simple reason – to save our democracy….Now, it is up to Congress to confront this egregious assault on our democracy. And after this, ***we're going to walk down, and I'll be there with you***, we're going to walk down…I know that everyone here will soon be marching over to the *Capitol building* to peacefully and patriotically make your voices heard….And they want to recertify their votes…**But the only way that can happen is if Mike Pence agrees to send it back…If not…you will have an illegitimate President.** That's what you'll

---

[3] *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554.

have. And we can't let that happen…**We must stop the steal** and then we must ensure that such outrageous election fraud never happens again….**And we fight. We fight like hell**. **And if you don't fight like hell, you're not going to have a country anymore…..So we're going to, we're going to walk down Pennsylvania Avenue…And we're going to the Capitol, and we're going to try and give them the kind of pride and boldness that they need to take back our country.. So let's walk down Pennsylvania Ave**.[4]

When Mr. Andries arrived at the Ellipse and heard the riled up crowd encouraging others to go to the Capitol building, he followed them.[5] He was not part of any organized group, did not engage in any pre-planning, and was completely alone. Mr. Andries was also not wearing any military gear, rather had a Carhart jacket on, blue jeans, and sneakers. He had no prior intention of entering the Capitol building and on a whim decided to follow the crowd. When Mr. Andries appeared on the Capitol Grounds, he already observed a large crowd ahead of him. He arrived on the left side of the scaffolding on the West side of the building and joined others who were already chanting, "Let us in!"

Mr. Andries entered the Capitol building through the Senate Wing entrance at approximately 2:14 p.m. While he was among the first group that entered from

---

[4] Associated Press, *Transcript of Trump's Speech at Rally Before US Capitol Riot*, U.S. News & World Report, Jan. 13, 2021, available at https://www.usnews.com/news/politics/articles/2021-01-13/transcript-of-trumps-speech-at-rally-before-us-capitol-riot (last viewed on Nov. 22, 2022). (emphases added).

[5] Even as the Capitol building was getting ravaged by a crowd with no leader, the former President Trump did and said nothing for hours. The only thing he did during the crucial hours of the attack was post a Tweet at 2:24 p.m. saying "Mike Pence didn't have the courage to do what should have been done to protect our country and our Constitution." *See* Ewan Palmer, *Donald Trump Tweeted Attack on Mike Pence Minutes After Hearing VP Was Fleeing Capitol Rioters*, Newsweek, February 11, 2021 available at https://www.newsweek.com/donald-trump-tweeted-attack-mike-pence-minutes-capitol-rioters-1568568. (last viewed on November 29, 2022).

that area, he did not join the individuals who broke the windows to gain entry.

When he entered, Mr. Andries was not met with resistance from law enforcement.

He then made his way through the Crypt. Notably, Mr. Andries did not use violence

towards law enforcement trying to keep the crowd back. In fact, while inside the

Crypt, Mr. Andries encouraged others to calm down. While the CCTV cameras do

not have sound, he can be seen gesticulating his arms towards the crowd from top to

bottom expressing his wish that they calm down.





Mr. Andries then moved through the Statutory Hall Connecter while filming himself on his phone.[6] Mr. Andries narrated on his video that he was earlier chanting "No violence!" Shortly thereafter, Mr. Andries is heard saying "Don't push, we have to be safe."[7] He then followed the crowd towards the second floor hallway outside of the Speaker's lobby. Mr. Andries continued to film himself making comments that clearly suggested he did not understand the gravity of what was occurring. This is notable because it shows the power of "mob mentality" at its finest – leading ordinary people to do something crazy because others are also doing

---

[6] Notably, Mr. Andries did not delete these videos containing the most incriminating evidence against him.

[7] The government previously provided this video evidence among others to the Court per its request during the litigation on the defendant's motion to dismiss.

it.[8] Mr. Andries then heard the sound of Ashli Babbit getting shot and reality sunk in quickly.

At that point, Mr. Andries focused on getting Ashli Babbit help and tried to clear a path for officers to take her out of the building. Mr. Andries then proceeded towards the exit. People around him were tense after watching a small woman get shot right before them. This caused tensions to be high and as Mr. Andries was getting close to the exit, a scuffle broke out behind him. Mr. Andries turned back to see what was going on and law enforcement pushed him backwards. Mr. Andries did not push back but did find a way around the officer. Within seconds, Mr. Andries was pushed out of the building by law enforcement. Mr. Andries's intention was not to avoid leaving the building but rather to help an individual who was caught up in the scuffle. When Mr. Andries left the building, he told an officer who was trying to remove him that he was being "civilly disobedient." In fact, he placed his hands up in the air signaling he would not hurt the officers.

Mr. Andries acknowledges how misguided he was that day and now sees how his actions contributed to the overall events regardless of his wish for things to remain non-violent. Immediately after January 6, 2021, Mr. Andries began to show remorse for what he had done. He ceased using Facebook and complied with the execution of the arrest warrant and search warrant, which uncovered incriminating

---

[8] Mob mentality is fueled when there is no apparent structure or strategy and when the crowd has no shared goal or common plan. *See* Benedict Carey, Making Sense of the 'Mob' Mentality, New York Times (Jan. 12, 2021) available at https://www.nytimes.com/2021/01/12/science/crowds-mob-psychology.html (last viewed November 30, 2022).

evidence from his phone. He also identified the jacket he was wearing to law enforcement, which made it easier for them to identify Mr. Andries's movements on January 6, 2021. Mr. Andries accepted responsibility for what he did by entering a plea of guilty to the most serious charge in the indictment against him. He did so, even while the validity of this particular felony is being litigated in the D.C. Circuit Court of Appeals with a decision still pending. *See U.S. v. Miller*, 22-3041 (D.C. Cir. 2022). Mr. Andries again expresses sincere remorse in his letter to the Court where he explains:

> I do not know why I did the things I did, and have certainly come to regret my actions that day. On that day, the energy of the crowd was intense, and I learned first-hand what "mob mentality" meant. None of this I say to excuse my actions……I have often told others how much I wish I had not approached the Capitol.

*See* Exhibit 2, Letter from John Andries.

Lastly, Mr. Andries has the support of friends and family who describe him as having a good character. *See* Exhibit 3, Letters of Support. His neighbor, Andrew Gardiner, has known Mr. Andries for 10 years and describes him as a loving father to his son and also explains that "he is truly sorry and ashamed of his misdeeds." *Id*. Another neighbor and fellow Veteran, Colonel Poe, describes Mr. Andries as an "honorable, trustworthy, and loyal man." *Id*. Mr. Andries's older sister expresses that he has always been a loving brother and that she is most proud of her brother "seeing him as a father," explaining that "he took on the duty of a passionate and loving father instantly." *Id*. Mr. Andries's mother, who currently lives with him, explains that her son devotes all of his time to his son when he is with him and that

he is "working to better himself for his son, family, and community." *Id*. Mr. Andries's stepmother describes him as an "asset to his community and country" who "will help anyone who needs his help if possible." Mr. Andries's father describes his son as a "great dad" who always takes responsibility and "alters as necessary." *Id*. Lastly, Mr. Andries's cousins describe him as a "good man" who is "a committed, dedicated and loving dad." *Id*.

### c. The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

Mr. Andries has been more than specifically deterred for his conduct. Firstly, he has never been convicted of a felony and has never served more than 10 days in jail. Simply being convicted of a felony will forever impact his life as he has been stripped of many rights, including the right to vote and the right to possess a firearm. While Mr. Andries has had two legal matters in Maryland (one of which is pending), he has been otherwise compliant with the conditions of his pre-trial release, checking in with his officer regularly, attending counseling and treatment, and complying with his GPS monitoring condition.

Furthermore, the collateral consequences he has suffered as a result of this case have been severe. Even before he was arrested for the instant matter, Mr. Andries had a strained relationship with his ex-wife whom he shares a child with. The custody of this child has always been in dispute. After Mr. Andries was arrested, the family court presiding over their custody dispute has considered the instant offense in deciding the several matters before it. In fact, shortly after his

arrest, Mr. Andries was ordered to be on supervised visitation with his own son,

which he is still subject to, only allowing him to have supervised visits on the

weekends. While there were other considerations before the family court that also

led to this decision, his pending charge for his conduct on January 6, 2021, made

matters much worse and decreased his credibility before the family court. As a

result of the stress of his pending criminal and family court cases, ███████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████ .[9] ███████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████

        If a significant period of incarceration is imposed, Mr. Andries' progress in

family court and with his son will experience a major setback. His regular

counseling and treatment with the VA and structured visitation schedule with his

son is important to his future success and incarceration would derail those efforts.

Mr. Andries's recommendation to the Court was carefully considered and if imposed

---

[9] Mr. Andries has a pending charge for an alleged altercation with his ex-wife's boyfriend. Mr. Andries was not under the influence during this incident but rather was defending himself from an attack that was unprovoked. *See* ECF No. 67, Exhibit 1.

would mean that 8 weekends of visitation with his son would not be possible. Mr. Andries only hopes that his absence would not have a grave impact on any future court orders but at the same time recognizes the seriousness of his offense in making a recommendation to the Court.

The recommended sentence would be consistent with past sentences imposed for similar charges and conduct. Although there are no cases that are identical, a review of past January 6 sentences imposed for other defendants convicted of 18 U.S.C. §1512(c)(2) further demonstrates that a downward variance is warranted in the instant case.[10]

> • *US v. Matthew Wood*, 21-cr-223 (APM): After consideration of all of the sentencing factors, the court rejected the government's request for 57 months' incarceration and imposed a sentence of one year home confinement for a defendant who was convicted of 18 U.S.C. §1512(c)(2). The court took into account many mitigating factors, such as the fact that Mr. Wood turned himself in, and traveled to D.C. with his grandmother. Mr. Wood was also only 23 years old. However, Mr. Wood's conduct on January 6, 2021, shares some similarities with Mr. Andries's conduct. They were both in the same general area on the Capitol Grounds, both entering the Senate Wing Window at the same time. Mr. Wood also made his way through the Crypt, filming the activities and commenting that

---

[10] This analysis in no way suggests that the defense believes that the sentences where incarceration was imposed were appropriate sentences, but rather is just a factual analysis of what occurred in each case to argue that Mr. Andries's recommendation would not create an unwanted sentencing disparity.

"we are going to bust into the house chambers." Although Mr. Wood was not near the Speaker's Lobby, he entered into the Speaker's conference room and picked up a glass of water and drank from it. Mr. Andries acknowledges some of the differences in his case, however Mr. Andries also has many mitigating circumstances that should be taken into consideration.

- *US v. Richard Michetti,* 21-cr-232 (CRC): Defendant sentenced to 9 months' incarceration after pleading guilty to 18 U.S.C. §1512(c)(2). Mr. Michetti's sentencing guideline range was 15-21 months. The government accused Mr. Michetti of yelling at police while they were being assaulted by others – calling them "fucking animals." The government also alleged that he briefly pinched the sleeve of another officer and continued to push against a police line in the Rotunda after being hit by chemical spray.

- *US v. Paul Hodgkins,* 21-cr-188 (RDM): defendant sentenced to 8 months' incarceration after pleading guilty to 18 U.S.C. §1512(c)(2). Mr. Hodgkins was accused of entering the Senate Chamber, a sensitive area that Mr. Andries did not enter. He was also accused of bringing a backpack containing protective eye goggles, rope, and white latex gloves. However, the court considered his early acceptance of responsibility in giving a variant sentence.

There are also past January 6 defendants who were offered a plea to Civil Disorder in violation of 18 U.S.C. §231(a)(3) whose cases are comparable and

involved similar and even more egregious conduct than that of Mr. Andries. Simply because the guidelines are substantially lower for Civil Disorder than the Obstruction charge, many of these defendants received significantly lower sentences than defendants who pled guilty to 18 U.S.C. §1512(c)(2) despite their conduct being fairly similar and/or more aggravating.

- *US v. Aaron Mostofsky,* 21-cr-138 (JEB): Defendant sentenced to 8 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3) and 18 U.S.C. §641. Mr. Mostofsky's guideline range was 12-18 months mostly because the Civil Disorder guidelines call for a much lower range. He was accused of forcibly engaging in confrontation with police by pushing against a barrier with all of his strength to resist officer efforts to contain the riot. Mr. Mostofsky also allegedly took a bullet proof vest that a Capitol Police officer was wearing and later wore this along with a riot shield he found. Also unlike Mr. Andries, Mr. Mostofsky arrived at 1:30 p.m., when the crux of the first wave of violence was taking place.

- *US v. Jerry Ryals*, 21-cr-244 (CKK): Defendant sentenced to 9 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). He allegedly entered the Capitol building saying "we definitely have enough people to overthrow this bitch," and tried to break down a locked office door with a sign and his shoulders. That door was eventually broken after other rioters joined his efforts. Mr. Ryals later allegedly posted that he was a patriot and that the country was headed to war.

- *US v. Daniel Johnson,* 21-cr-407 (DLF): Defendant sentenced to 4 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Johnson allegedly pushed against a line of officers who were guarding East Rotunda doors trying to prevent rioters from gaining entry to the building. The pushing of rioters caused these officers to be sandwiched against the doors and the effort of the rioters were successful as that door was breached. Mr. Johnson also allegedly said afterwards that he was trying to find a way into the Senate Chamber.

- *US v. David Blair,* 21-cr-186 (CRC): defendant sentenced to 5 months' incarceration after pleading guilty to 18 U.S.C. §231(a)(3). Mr. Blair was accused of bringing tactical gloves, carrying a lacrosse stick with a large Confederate flag attached to it and using that stick to push against a police officer's chest. The government also alleged he carried a backpack with a knife and roll of duct tape inside.  Mr. Blair never made it inside the Capitol building because he was detained on the spot after assaulting officers with his stick.

It is also worthwhile to analyze some of the past misdemeanor sentences with aggravating conduct because it further highlights the sentencing disparities that have resulted simply based on arbitrary lines that the government has drawn when extending plea offers. These misdemeanor cases highlight the fact that when analyzing the facts of each case – the conduct is not too dissimilar from that of Mr. Andries.

- *US v. Felipe Marquez*, 21-cr-136 (RC): Mr. Marquez was sentenced to 18 months' probation with the condition that he serve 3 months' home detention after pleading guilty to 18 U.S.C. §1752(a)(2). While Mr. Marquez had many mitigating circumstances that the Court took into consideration, he also allegedly was right behind a mob that pushed past officers at the Senate Wing Door, entered into Senator Merkley's office which suffered substantial damage, spent almost an hour inside the Capitol building, and made comments making light of the damage that the Capitol building sustained.

- *US v. David Mish,* 21-cr-112 (CJN): Sentenced to 30 days' incarceration with no supervision to follow after pleading guilty to 40 U.S.C. §5104 (e)(2)(G). Mr. Mish also witnessed the Ashli Babbit shooting and was close to the Speaker's lobby. Like Mr. Andries, he also had a mostly petty criminal history. Also like Mr. Andries, Mr. Mish accepted responsibility and cooperated with law enforcement.

- *US v. Michael Timbrook,* 21-cr-361 (TNM): Mr. Timbrook was sentenced to 14 days' intermittent incarceration after pleading guilty to 40 U.S.C. §5104 (e)(2)(G).  While he was not involved in any violence, he was at the forefront of many key police breaches, witnessing many assaults against police officers. He also entered Nancy Pelosi's office, shuffling some papers around. The Court, however, considered the fact that he was compliant with pre-trial release conditions and was 57 years old with a lot of family support.

• *US v. Jacob Wiedrich,* 21-cr-581 (TFH): Mr. Wiedrich was sentenced to

probation with 90 days' home detention after pleading guilty to 40 U.S.C.

§5104 (e)(2)(G). Mr. Wiedrich was a young man who was just following the

older crowd. However, he also entered through the Senate Wing door, except

unlike Mr. Andries, he was met with resistance by officers and chanted at

officers. Mr. Wiedrich also stole a US flag from the Capitol building which

was later recovered from his home. Mr. Wiedrich also accepted responsibility

and was cooperative with law enforcement.

• *US v. William Tryon,* 21-cr-420 (RBW): Mr. Tryon was sentenced to 50 days'

incarceration after pleading guilty to 18 U.S.C. §1752(a)(1). The government

alleged that Mr. Tryon was actually met with resistance from Capitol Police

while attempting to gain entry into the Capitol building. The government

also accused him of refusing to comply with Capitol Police commands and

was pepper-sprayed and hit by a baton by them. Mr. Tryon allegedly did not

give up and eventually gained entry into the building.

• *US v. Jeffrey Register, 21-cr-349 (TJK):* Mr. Register was sentenced to 75

days' incarceration after entering a guilty plea to 40 U.S.C. §5104 (e)(2)(G).

The government accused Mr. Register of being on the Grounds and inside the

Capitol building for 90 minutes, deliberately destroying evidence, and telling

FBI that he never went inside the building. Notably, the government also

accused Mr. Register of running past officers who were trying to contain a

surge of rioters. The government further alleged that Mr. Register waved the

crowd towards an access point to the Speaker's Lobby and eventually witnessed the killing of Ashli Babbit.

• *US v. Camper*, 21-cr-325 (CKK): Mr. Camper was sentenced to 60 days' incarceration. Mr. Camper allegedly gave a television interview after exiting the Capitol building, saying his actions were justified because he was operating under the "insurrection act." The government also accused him of burying Go-Pro footage from January 6 in the ground. He also allegedly maintained to the FBI that he had done nothing wrong and believed he was in a "combat" state of mind while at the building.

All of these past cases highlight the fact that there has been inconsistencies across the board with how the government has been charging cases and with the plea offers it extends. Nonetheless, these past sentences further support a significant variant sentence in the instant matter.

## General Deterrence

Sentencing Mr. Andries to a significant period of incarceration is not the way to ensure that the isolated events on January 6 will never occur again. An event like January 6 is unlikely to happen again[11] Even if it did, the public will not be deterred by a simple man from Maryland who is not an extremist. Empirical evidence proves that the certainty of prosecution, rather than the severity of the

---

[11] *See* transcript of video sentencing in *United States v. Douglas Sweet*, 21CR41-3 (The Honorable Judge Nichols states, "It is unlikely that the circumstances of led to their actions on January 6 will occur again. It is unlikely that the sitting President will invite them, as part of a large crow, to protest and demonstrate, even fight at the Capitol. . . ").

punishment is the greater deterrent.[12] Individuals like Mr. Andries have already been deterred by this threat of prosecution. Most individuals involved in January 6, 2021, were encouraged to do what they did by the most powerful executive in our country and yet the government has not hesitated to prosecute these individuals to the fullest extent possible. Incarceration with most of these cases is not the answer and perhaps to really effect general deterrence, something very different is needed so that individuals do not fall victim to the dangerous propaganda that incited January 6, 2021.

The Honorable Amit P. Mehta alluded to this dilemma in a recent sentencing hearing encouraging us all to ask ourselves why ordinary American citizens from all over the country, and often times even Veterans, came together to commit these acts. *United States v. Andrew Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at 26-28. Judge Mehta opined that this was able to occur because of:

> [T]he power of propaganda; the power of being told lies over and over and over again; told by leaders who knew better, that something was taken away from people when it wasn't…the idea that people who have otherwise led modest and humble lives, who have not been political agitators, political activists, are now facing serious jail time is extraordinary. *Id*.

**d.** 

---

[12] *See* National Institute of Justice, *Five Things About Deterrence* (June 5, 2016), full article available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence

[13]



██████████████████████████████████████████████

████████████████████████.[16]

████████████████████████████████████████████

██████████████████████████████████████████

████████ For these reasons, he respectfully requests that the Court grant a

downward variance from the sentencing guidelines pursuant to 18 U.S.C.

§3553(a)(2)(D).

### III.   The Guideline Range Should be 18-24 Months and Not 30-37 Months as Probation Suggests

Probation has calculated Mr. Andries's sentencing guidelines to be 30-

37 because it has not assessed a three level reduction for acceptance of

responsibility and because it scores a prior conviction that should not be

scored. *See* PSR ¶ 43, 49. However, probation should have assessed a three

level reduction for acceptance (especially in light of the fact that the

government did not request otherwise) and Resisting Arrest is not a scoreable

offense in these circumstances.

Firstly, despite Mr. Andries pleading guilty to the most serious charge,

and waiving his right to further contest the applicability of 18 U.S.C. §1512

and accept responsibility instead, the probation department still believes he

---

[16] ████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████
██████████████████████████████.

██

should not get any credit for acceptance. In support, it cites to only one factor it should consider among many other factors. *See* PSR at pg. 25 (citing to USSG §3E1.1, comment (n.1). Probation also incorrectly states that Mr. Andries' pending charge is similar to the instant offense as he pled guilty to Obstruction of an Official Proceeding and not Assault. Probation then references Mr. Andries' prior conviction from early 2022, long before he entered a plea of guilty in this matter. From probation's perspective, all of these circumstances indicate a pattern of lack of acceptance of responsibility. *Id*. However, in making this damaging conclusion, probation failed to assess the remaining factors in USSG §3E1.1 to make a fair determination as to whether or not he should receive a three level reduction. These other factors include:

- Truthfully admitting the conduct comprising the offense of conviction;
- Voluntary assistance to authorities promptly after commission of the offense;
- Post-offense rehabilitative efforts;
- Timeliness of the defendant's conduct in manifesting the acceptance of responsibility

USSG §3E1.1 (A), (E), (G), and (H). In assessing these other factors that the Sentencing Commission provides, it is clear that Mr. Andries has more than accepted responsibility. He separated himself from the events of January 6, 2021, immediately after, and showed a lack of remorse immediately. He

accepted responsibility shortly after the Court ruled on the applicability of 18 U.S.C. §1512, he helped law enforcement identify incriminating evidence, and he has engaged in post rehabilitative efforts.

Most importantly, the probation office gives no consideration for the fact that his pending charge is *still pending* and there has been no assignment of guilt. Probation argues that the guidelines do not specify that the defendant must be convicted of new conduct. *See* PSR at pg. 25. However, it clearly does specify such as USSG §3E1.1(B), upon which probation exclusively relies upon, says "voluntary termination or withdrawal from *criminal conduct* or associations." The guidelines do not say "pending criminal charge," rather they specifically say "criminal conduct." There has not been an assignment of criminal conduct because our criminal justice system does not do so until and if there is a conviction.

Secondly, probation scored a February 2022 Resisting Arrest conviction that resulted in a period of unsupervised probation. Probation explained that it did so correctly because there is no distinction between supervised and unsupervised probation and that Resisting Arrest is similar to the instant offense. However, USSG §4A1.2 (c)(1) does make a distinction between unsupervised probation and probation as it specifies that the offense is only to be scored if a sentence of "probation" of more than one year is imposed. Probation cites to USSG §4A1.1, comment, (n.4), where the guidelines do say that a criminal justice sentence includes unsupervised

probation for purposes of scoring regular offenses. However, this provision refers only to whether or not two points should be added if the defendant committed any part of the instant offense while under supervision (4A1.1(d)) specifying:

> For purposes of this subsection, a "criminal justice sentence" means a sentence countable under §4A1.2 having a custodial or supervisory component, although active supervision is not required for *this subsection*.

However, USSG §4A1.2 (c)(1) does not create this exception in its commentary section and so the commentary section on §4A1.1(d) should not be considered.

Lastly, probation is incorrect that Resisting Arrest is similar to the instant offense as he was not charged or convicted with Resisting Arrest. While Mr. Andries was forcibly removed by law enforcement on the steps of the Capitol, he was not under arrest and so did not resist arrest.

After weighing all of the factors above and considering the fact that Mr. Andries has not been convicted of new criminal conduct after entering a plea in this case, the Court should reject probation's recommendation that Mr. Andries be stripped of his credit for acceptance of responsibility that he has clearly earned. Furthermore, the Court should not accept probation's recommendation that a Resisting Arrest charge be scored as it does not meet the qualifications under the Sentencing Guidelines.

## IV. Probation's Calculation of Mr. Andries's Criminal History Category Substantially Over-Represents the Seriousness of his Criminal History

Even if the Court agrees with probation's calculation of the sentencing guidelines, Mr. Andries requests that the Court grant a variance because his criminal history category overstates the seriousness of his criminal history.[17]

Probation has scored Mr. Andries's criminal history category to in category III based on four criminal history points. *See* PSR ¶ 52. Two of those four points are based solely on the fact that technically, at the time of the instant offense, Mr. Andries was on unsupervised probation for a misdemeanor Driving Under the Influence of Alcohol conviction from 2020. *Id*. at 48. Not only was he not on active supervision for a misdemeanor offense, but this period of supervision has also since expired. When taking into account the nature of the offense and the nature of his supervision, these extra two points overstate the severity of his criminal history by increasing his criminal history category and entire level.

Lastly, even if the Court disagrees with Mr. Andries that probation incorrectly scored a point for his Resisting Arrest Conviction, the nature of the offense being typically unscorable also overstates the severity of his criminal history. The only reason probation believes this conviction should be scored is its belief that unsupervised probation should be treated the same as supervised probation. Even if probation is correct, there is a meaningful and real life difference between the two. One means an individual actively must

---

[17] As explained above, Mr. Andries waived his ability to specifically request a departure unless the government waives that provision. However, the Court can grant a variance for the same reasons explained in USSG §4A1.3(b)(1).

participate in supervision conditions while the other essentially means supervision is inactive unless the individual violates the law. Taking into account this difference, scoring this conviction would overstate the severity of the conviction, especially because it takes Mr. Andries from Criminal History Category II to III.

Lastly, Mr. Andries does not have a significant criminal history as it consists of two misdemeanor offenses, having no prior violent convictions or felonies. Criminal History Category III suggests a history that involves far more than that and so does not adequately take into consideration the lack of severity surrounding his past criminal history.

## CONCLUSION

For the reasons stated above, Mr. Andries respectfully requests that the Court grant his request for a significant downward variance as described above. Mr. Andries also requests that a fine not be imposed in light of the fact that he has a $2,000 restitution obligation.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Maria N. Jacob
Assistant Federal Public Defender

625 Indiana Ave. NW, Ste. 550
Washington, D.C. 20004
(202) 208-7500
Maria_jacob@fd.org